**In re OM GROUP SECURITIES LITIGATION**

**No. 1:02CV2163.**

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 28, 2005.

580

Darren J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach, Henry R. Rosen, Stephanie Schroder, Tor Gronborg, William S. Lerach, Lerach, Coughlin, Stoia & Robbins, Brian J. Robbins, Robbins, Umeda & Fink, San Diego, CA, Guri Ademi, Ademi & O'Reilly, LLP, Cudahy, WI, Jack Landskroner, Landskroner Grieco Madden, R. Eric Kennedy, Weisman, Kennedy & Berris, John R. Climaco, David M. Cuppage, Scott D. Simpkins, Climaco, Lefkowitz, Peca, Wilcox & Garofoli, William J. Lucas, Cleveland, OH, Mark A. Topaz, Schiffrin & Barroway, LLP, Radnor, PA, Hannah E. Greenwald, Daniel L. Berger, Douglas M. McKeige, Gerald H. Silk, Bernstein Litowitz Berger & Grossman LLP, New York, NY, James R. Cummins, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Plaintiffs.

Wallace Cropper, Pro Se.

William Denson, Pro Se.

Martin Hablutzel, Pro Se.

David H. Kistenbroker, Denise E. Conklin, Carl E. Volz, Laura M. Vasey, Leah J. Domitrovic, David H. Kistenbroker, Theresa L. Davis, David H. Kistenbroker, Katten, Muchin, Zavis, Rosenman, Chicago, IL, James R. Wooley, Stephan J. Schlegelmilch, Baker & Hostetler, Michael J. Scott, Tim L. Collins, Collins & Scanlon, Frances F. Goins, Ulmer & Berne, Hugh E. McKay, Porter, Wright, Morris & Arthur, Kimberly M. Moses, Mitchell G. Blair, Calfee, Halter & Griswold, Pearson N. Bownas, Jones, Day, Reavis & Pogue, Cleveland, OH, Eric Twiste, Steven B. Rosenfeld, Paul, Weiss, Rifkind, Whatron & Garrison LLP, Deirdre E. Norton, Elissa Rossi, Michael R. Young, Scott S. Rose, Willkie, Farr & Gallagher LLP, New York, NY, Geoffrey S. Irwin, Stephen J. Brogan, James E. Gauch, Jones Day, Washington, DC, for Defendants.

## *ORDER*

VECCHIARELLI, United States Magistrate Judge.

On October 5, 2004, Plaintiff filed a Motion to Compel, requesting the Court to compel

the Audit Committee to produce the documents listed on the Audit Committee's privilege log relating to its investigation.[1] (Doc. No. 254.) For the reasons set forth in detail below, Plaintiff's Motion to Compel (Doc. No. 254) is GRANTED in part and DENIED in part.

Specifically, the work-product doctrine does not protect any of the Log Entries. All of the Log Entries are protected by the attorney-client privilege,[2] unless the privilege was waived, except for Log Entry Nos. 83, 84, 229, 299. Defendants shall produce to Plaintiff Log Entry Nos. 83, 84, 229, 299. Further, Defendants shall produce Log Entry Nos. 16, 100, and 255 because Defendants only asserted the work-product doctrine to these documents. Defendants waived the attorney-client privilege to, and shall disclose to Plaintiff, all documents prepared on or before March 15, 2004 relating to, referred to and/or relied upon for the Audit Committee's presentation to the Board of Directors. The presentation addressed, among other things, the following topics:

1. the work-in process inventory, in-transit/resupply inventory, full absorption costs, and "other issues" at the Franklin Facility, including all interviews referenced and relied on for this topic, see Presentation, pp. OMG1626686–92;

2. the estimated value of inventory at the St. George Facility, see Presentation, pp. OMG1626693–96;

3. the double-counting of full-absorption costs at the Midland Facility, see Presentation, pp. OMG1626697;

4. the absence of pounds of any material or product associated with the book inventory as of late 2002 at the Tacow Facility, including all interviews referenced and relied on for this topic, see Presentation, p. OMG1626698;

5. The additional capitalization of direct costs and overhead and "other issues" at the Kokkola and Harjavalta Facilities, including all interviews referenced and relied on for this topic, see Presentation, pp. OMG1626699–707.

## I. Background

On October 5, 2004, Plaintiff submitted a letter to the Court requesting the Court to compel the Audit Committee to produce the documents listed on its privilege log relating to its investigation. Defendants OMG and James Mooney (collectively "Defendants") claim the documents are protected by the attorney-client and/or work-product privileges.[3] After holding a telephone conference to address the issue, the Court ordered the party asserting a privilege to the documents to provide the Court with: (1) the documents for an *in camera* review; and (2) a statement setting forth specific facts, evidence, and law showing why the documents are protected by the privilege.[4] Defendants have submitted the documents and the parties have briefed the privilege issue.

---

1. Plaintiff presented this issue to the Court in a letter brief. After a discussion with the parties, the Court indicated that it would treat the letter brief as a formal motion to compel the production of documents.

2. These documents are privileged unless the privilege has been waived as part of the Audit Committee's presentation to the Board of Directors. *See* discussion of waiver, *infra*. Moreover, as both parties assume for the purposes of their arguments that the Audit Committee's presentation to the Board of Directors was subject to the attorney-client privilege but focus their arguments on whether the privilege was waived, this court also has assumed, without deciding, that the presentation was privileged.

3. OMG claims the Audit Committee is "legally distinct" from OMG. (Defendant's Opposition at 4). In the brief, the OMG claims that the privi-

lege belongs to the Audit Committee because it is separate and distinct from the Board of Directors. It is well established that only the party holding the attorney-client privilege may assert it. The Audit Committee did not file the brief objecting to the production of documents on privilege grounds, OMG and Mooney did. Nevertheless, this Court will address the issue raised by OMG and Mooney because it is clear the Audit Committee has raised the issue through the affidavit of its counsel, Paul Ferrillo. As Plaintiff's counsel notes, OMG has not been consistent in its treatment of the Audit Committee, sometimes referring to it as separate, but at other times ignoring the distinction. (Plaintiff's Reply at 7, n. 5).

4. The Court also ordered counsel for the Audit Committee to supplement the privilege log with any documents to which the Audit Committee is asserting a privilege.

The documents in dispute were prepared by the Audit Committee's counsel, Weil, Gotshal & Manges, LLP ("WGM"), WGM's retained forensic accountants, FTI–Ten Eyck Associates ("Ten Eyck"), and/or OMG employees.[5] The Audit Committee asserts the attorney-client and work-product privileges to the following:

-Interview notes of OMG employees prepared by WGM and/or Ten Eyck;

-Notes prepared by WGM and/or Ten Eyck regarding presentations and meetings with the Audit Committee;

-Spreadsheets, notes, or data prepared by Ten Eyck;

-Emails between or among Ten Eyck, WGM, and/or the Audit Committee;

-Emails between or among Ten Eyck, WGM, the Audit Committee, and/or OMG employees;

-Emails between or among Ten Eyck, WGM, the Audit Committee, Squire, Sanders & Dempsey, LLP ("SS & D"),[6] OMG employees, and/or Katten Muchin Zavis Rosenman ("KMZR").[7]

The Audit Committee asserts only the attorney-client privilege to the following:

-Emails between or among Ten Eyck, WGM, and/or the Audit Committee;

-Emails between or among Ten Eyck, WGM, the Audit Committee, SS & D, OMG employees, and/or KMZR.

The Audit Committee asserts only the work-product doctrine to the following:

-Interview notes of meetings with OMG employees prepared by WGM and/or Ten Eyck.

## II. Analysis

### A. Work–Product Doctrine

■ Defendants assert that numerous documents are protected by the work-product doctrine. This Court adopts the procedure set forth in *Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335 (6th Cir.

1988) to analyze a claim that materials were prepared in anticipation of litigation or for trial and, thus, are protected by the work product doctrine. First, the requesting party must show that the materials requested are relevant to the subject matter involved in the pending litigation and not privileged. Second, if the requesting party meets its burden, the objecting party must show that the material was prepared in anticipation of litigation or for trial by or for that party or that party's representative (including that party's attorney, consultant, surety, indemnitor, insurer, or agent). Third, if the objecting party meets its burden, the requesting party must show that it has substantial need of the materials in preparation of the party's case, and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Fourth, if the requesting party shows that it has substantial need of the material and is unable without due hardship to obtain the substantial equivalent, the court shall still protect the material from disclosure if the objecting party shows that the nature of the materials are mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the party concerning the litigation. *Id.* at 339–40.

### 1. Anticipation of Litigation

■ The objecting party must show that the material was prepared in anticipation of litigation by or for that party or that party's representative (including that party's attorney, consultant, surety, indemnitor, insurer, or agent). Courts have used various tests to address the meaning of a document prepared in anticipation of litigation. *See Guardsmark, Inc. v. Blue Cross and Blue Shield of Tennessee*, 206 F.R.D. 202, 209 (W.D.Tenn.2002) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C.Cir.1998)) (For material to be prepared in anticipation of litigation, the objecting party "must at least have had a subjective belief that litigation was a

---

5. On January 4, 2005, the Audit Committee submitted to the Court recently discovered documents created by Ten Eyck, along with a second supplemental privilege log identifying the new documents as Log Entry Nos. 317 to 333.

6. SS & D formerly served as local counsel for Defendants.

7. KMZR serves as counsel for OMG.

real possibility, and that belief must have been objectively reasonable"); [8] *see also Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 181 (S.D.Ohio 1993) ("[T]he scope of protection is limited to that time in which a real and substantial possibility of litigation exists"). "Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect [sic], there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation." 8 Wright, Miller, & Marcus, *Federal Practice and Procedure*, § 2024 (2 ed.1994); *see also Amway Corp. v. The Procter & Gamble Co.*, 2001 WL 1818698, *6, 2001 U.S. Dist. LEXIS 4561, *20 (W.D.Mich.2001) (When it is clear that documents would have been prepared independent of any anticipation of use in litigation, no work-product can attach.).

After reviewing the various tests, this Court concludes that in order to meet the "anticipation of litigation" standard, Defendants must show at least that (1) a real possibility of litigation existed at the time the documents were prepared and (2) the documents were prepared because of a real possibility of litigation, not for ordinary business purposes. Each prong will be addressed separately.

### a. Real Possibility of Litigation

■ Defendants claim they have met the anticipation of litigation standard because, prior to the investigation regarding OMG's inventory, (1) OMG shareholders filed a direct action against OMG and certain officers and directors for alleged accounting improprieties and filed a derivative action against certain officers and directors for alleged

breaches of fiduciary duty arising out of the alleged accounting improprieties, and (2) the SEC's Division of Corporate Finance inquired into representations made in OMG's financial statements regarding its inventory methods and questioned OMG's responses to the inquiry.

This Court finds that a real possibility of litigation existed throughout the Audit Committee is investigation. The investigation involved OMG's inventories. Any inventory problems revealed through the investigation likely related to the alleged accounting improprieties that comprised the instant action at the time of the investigation and the SEC's inquiry into OMG's inventory amounts.[9] Moreover, the Audit Committee retained independent counsel. Clearly, given the particular circumstances, there was not only existing litigation, but also a real possibility that there would be additional charges by OMG shareholders or proceedings by the SEC. These documents, therefore, were created at a time when litigation was not only anticipated, but actually ongoing. Accordingly, this first prong is met.

### b. Documents Prepared *Because of* the Real Possibility of Litigation

■ Under this prong of the analysis, the Court must determine the reason for the creation of the documents. Plaintiff asserts that the Audit Committee prepared the documents for a business purpose, *i.e.*, to address OMG's inventory concerns that directly affected its earnings and financial statements, and not because of the possibility of litigation. In a March 16, 2004 press release, OMG stated that an audit committee was conducting an investigation of the company's board of directors *regarding inventory issues.* Further, in an August 2, 2004 press release, OMG stated that the Audit Committee found certain adjustments to inventory were improperly recorded, which resulted in the overstatement of net earnings for 1999,

---

8. The *Sealed Case* indicated a court must determine whether "under all the circumstances the [objecting party] prepared [the documents] in anticipation of litigation, or whether they were prepared in the ordinary course of business." *Sealed Case*, 146 F.3d at 888.

9. In fact, after the Audit Committee released its findings, Plaintiff amended its complaint by adding new parties and allegations.

2000, and 2001. The findings of the investigation led OMG to restate its financial results for 1999 to 2003. Plaintiff relies upon the testimony of Ernest Ten Eyck, a member of the FTI–Ten Eyck consulting firm ("Ten Eyck") that WGM retained to aid in the investigation. Ernest Ten Eyck stated that, to his knowledge, Ten Eyck's engagement in the investigation was not expressly related to any litigation matters and, at the Board of Directors' meeting where WGM and Ten Eyck presented the evidence and findings, there was no discussion of litigation.[10] (Doc. No. 278, Exh. B, pp. 8: 13–19, 18:18–21.)

On the other hand, Defendants not only claim the Audit Committee prepared the documents for both business and litigation purposes, but also claim litigation was the dominant reason. Defendants assert that (1) the investigation arose out of the shareholder litigations and the SEC's inquiry into the inventory issues and (2) they anticipated additional shareholder allegations and SEC litigation. Paul Ferrillo of WGM stated that the Audit Committee retained WGM to "give legal advice and legal guidance to the Audit Committee in connection with the investiga-

tion concerning the inventory issues and give advice to the Audit Committee in connection with the [SEC] inquiry that was going on at the same time regarding inventory issues." [11] (Doc. No. 278, Exh. A., p. 70: 12–18.)

The documents consist of (1) interview notes and memoranda of OMG employees prepared by WGM, (2) interview notes and memoranda of OMG employees prepared by Ten Eyck, (3) notes regarding presentations and meetings with the Audit Committee prepared by either WGM or Ten Eyck,[12] (4) spreadsheets, memoranda, and notes prepared by Ten Eyck, and (5) emails. Most of the emails are between members of WGM and members of Ten Eyck. The other emails are between or among: (1) WGM members, (2) Ten Eyck members, (3) OMG employees and WGM or Ten Eyck members, (4) and OMG employees with copies forwarded to WGM and/or Ten Eyck members.

■ The content of the documents and communications address both purposes without identifying the motivating purpose for the document. Thus, the documents and communications were made for dual purposes

---

**10.** Plaintiff relies on *In re Leslie Fay Cos., Inc. Securities Litigation*, 161 F.R.D. 274, 280–81 (S.D.N.Y.1995) (The audit committee, its counsel, and retained accountants conducted the internal investigation primarily for business reasons); *McEwen v. Digitran Systems, Inc.*, 155 F.R.D. 678, (D.Utah 1994) (Counsel's retained accountants prepared the documents primarily to enable the re-issuance of the corporation's financial statements despite pending litigation and SEC investigation); *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, 1997 WL 118369, 1997 U.S. Dist. LEXIS 2927 (S.D.N.Y. 1997) (The documents were primarily prepared for business purposes in order to maintain the integrity of the financial reports of the corporation).

**11.** Defendants cite *Picard Chemical Inc. v. Perrigo Co.*, 951 F.Supp. 679 (W.D.Mich.1996), for the proposition that work-product immunity extends to documents that reflect both business and legal interests. However, the Court does not construe this proposition to be a blanket rule that protects all documents reflecting both legal and business interests. First, the document in issue in *Picard* was a report prepared by the corporation's only disinterested board member recommending whether a derivative lawsuit would be in the corporation's best interests. *Id.* at 683. In holding the document was protected by both the attorney-client and work-product privileges, the court in *Picard* implied that the document con-

tained business interests in addition to legal interests. It cited cases stating both interests are present in a corporate litigation context. Clearly, the document in *Picard* was prepared in anticipation of litigation and because of the litigation since it made a recommendation to the corporation to dismiss derivative suit. In the instant action, the dominant purpose of the documents is not clear. Second, the court in *Picard* cited the proposition from *In re Bairnco Corp. Securities Litig.*, 148 F.R.D. 91, 103 (S.D.N.Y.1993), a case stating the work-product inquiry is whether the motivating purpose behind the creation of the document was to assist in pending or impending litigation. This motivating purpose test for documents containing dual purposes is the same test applied in the cases cited by Plaintiff. Although the Sixth Circuit has not addressed the inquiry for dual purpose documents, other circuits have. *See Binks Mfg. Co. v. Nat'l Presto Indus.*, 709 F.2d 1109, 1118–19 (7th Cir.1983) (applying motivating purpose test); *Maine v. United States DOI*, 298 F.3d 60, 70 (1st Cir.2002) (Documents that would have been created in essentially similar form irrespective of the litigation are not protected even if such documents aid in the preparation of litigation).

**12.** One document, *i.e.*, Log Entry 195, reflected meeting minutes prepared by an OMG secretary.

regarding the inventory, *i.e.*, the possibility of litigation and business impact on past earnings and financial statements. After reviewing the evidence submitted and the documents themselves, this Court finds that such purposes are inextricably intertwined in this case and neither purpose dominates the other. Accordingly, the issue presented is whether the documents would have been generated in the absence of pending or possible future litigation. *See Maine v. United States DOI*, 298 F.3d 60, 70 (1st Cir.2002).

On March 15, 2004, three months into the investigation, WGM and Ten Eyck gave a presentation to OMG's Board of Directors. There is no evidence that there was any discussion of litigation at the meeting. As a result of the meeting, on March 16, 2004, OMG announced that it anticipated restating its financial statements for 1999 through 2003. This indicates that the business purpose was a significant factor regardless of possible additional litigation. Accuracy of earnings and financial statements is clearly a business matter for all publicly-held corporations, regardless of whether litigation is pending or anticipated. Therefore, this Court concludes that the Audit Committee would have conducted the investigation and prepared the documents regardless of the possibility of additional litigation. The documents are not protected by the work-product doctrine. Thus, they should be produced unless they are subject to the attorney-client privilege.

**B. Attorney–Client Privilege**

■ Defendants' claim of attorney-client privilege requires a different analysis. Where a client seeks legal advice from a professional legal advisor, the communications relating to that purpose made in confidence are protected by the attorney-client privilege. *See Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir.1998). Defendants claim that the documents WGM prepared are protected by the attorney-client privilege because WGM prepared the documents for the purpose of rendering legal advice to the Audit Committee. Defendants also assert that the documents Ten Eyck prepared are protected

by this same privilege because Ten Eyck provided its analysis at the request of WGM for the purpose of enabling WGM to give legal advice to the Audit Committee. Further, Defendants assert that the email communications provided information to counsel for the purpose of enabling counsel to provide legal advice.

Defendants assert the attorney-client privilege protects: (1) interview notes and memoranda of OMG employees prepared by WGM; (2) interview notes and memoranda of OMG employees prepared by Ten Eyck; (3) notes regarding presentations and meetings with the Audit Committee prepared by either WGM or Ten Eyck;[13] (4) spreadsheets, memoranda, and notes prepared by Ten Eyck; (5) emails; and (6) statements prepared by OMG employees.

■ As this Court previously found in analyzing the documents under the work-product doctrine, the Audit Committee's investigation was conducted for both business and litigation purposes; these are dual purposes that cannot be separated. However, the test for determining the applicability of the attorney-client privilege is different than the tests for determining the applicability of the work-product doctrine. In the context of the attorney-client privilege, documents prepared for the purpose of obtaining or rendering legal advice are protected even though the documents also reflect or include business issues. *See Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F.Supp. 679, 685–86 (W.D.Mich.1996) (Legal and business considerations may frequently be inextricably intertwined when legal advice is rendered in the corporate context, but the fact that business considerations are weighed in the rendering of legal advice will not vitiate the attorney-client privilege.). The Court now will apply this principle to each category of documents.

**1. Interview notes and memoranda of OMG employees prepared by WGM**

■ This category of documents consists of interview notes, interview outlines, and memoranda summarizing the interviews of

**13.** One document, *i.e.*, Log Entry 195, reflected

meeting minutes prepared by an OMG secretary.

current and former OMG employees conducted and prepared by Paul Ferrillo of WGM, i.e., Log Entry Nos. 1–7, 9–10, 12–13, 15, 17, 20–21, 24–31, 48, 58, 63, 95, 104–107, 111–112, 114, 116–118, 197–199, 202–203, 208, 210–219, 230–321, 233–235, 305. After reviewing the documents, the Court concludes that the documents were prepared in confidence by WGM in order to provide legal advice to the Audit Committee. Therefore, these log entries are protected by the attorney client privilege.[14]

## 2. Interview notes and memoranda of OMG employees prepared by Ten Eyck

 This category of documents consists of interview notes, interview outlines, and memoranda summarizing the interviews of current and former OMG employees conducted and prepared by members of Ten Eyck, the forensic accountants retained by WGM, i.e., Log Entry Nos. 61, 62, 67, 79, 87–99, 101–103, 108, 110, 113, 115, 248, 251–253, 256, 258–276.[15]

 The attorney-client privilege extends to memoranda and working papers prepared by an accountant at an attorney's request to assist the attorney in giving legal advice to the client. See Toler v. U.S., 2003 WL 21255039, at *5, 2003 U.S. Dist. LEXIS 8565, at *13 (April 29, 2003) (S.D.Ohio); see also U.S. v. Kovel, 296 F.2d 918, 922 (2d Cir.1961) (If the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought to fall within the privilege.).

Defendant asserts that WGM retained Ten Eyck to assist counsel in the investigation. After reviewing the documents, this Court finds that Ten Eyck's notes and memoranda of the OMG employee interviews were made to assist WGM in providing legal advice to the Audit Committee. Therefore, these log entries are protected by the attorney-client privilege unless the privilege was otherwise waived.

## 3. Notes regarding presentations and meetings with the audit committee prepared by either WGM or Ten Eyck

 This category of documents consists of notes regarding presentations and meetings with the Audit Committee prepared by either WGM or Ten Eyck, i.e., Log Entry Nos. 8, 11, 14, 18, 19, 22, 23, 52, 55, 60, 72, 85, 195, 200, 201, 204, 207, 209, 220, 221, 232, 237, 316, or Ten Eyck, i.e., 55, 72, 76, 238, 239, 243, 247, 277, 285. After reviewing the documents, this Court concludes that these documents underlying the presentations and meetings were prepared by WGM and Ten Eyck in order to enable WGM to provide give legal advice to the Audit Committee. Therefore, these log entries are protected by the attorney-client privilege unless the privilege was otherwise waived.

## 4. Spreadsheets, memoranda, and notes prepared by Ten Eyck

 This category of documents consists of spreadsheets, memoranda, and notes prepared by Ten Eyck, i.e., Log Entry Nos. 32–39, 41, 42–46, 49, 50–51, 53–54, 57, 59, 64–66, 71, 73–75, 77–78, 80–81, 223, 224, 226–228, 236, 240–242, 244–246, 249–250, 254, 257, 278–281, 283–284, 286–293, 295–298, 300–302, 304, 318, 319, 322, 324, 326, 327, 329.

Plaintiff claims, without citation to any legal authority, that documents counsel for WGM failed to provide to the Audit Committee are not protected by the attorney-client privilege.[16] This argument is without merit. Documents created by an accountant at the

---

14. The documents are protected only to the extent the privilege was not waived. See discussion, re: Waiver, infra.

15. Although some of the documents were prepared after the Audit Committee completed its investigation, i.e., Log Entry Nos. 260, 262, 265, 267, 271, the documents relate to the investigation because they are simply summaries of interviews taken during the investigation.

16. Counsel for WGM testified that Log Entry Nos. 35, 39, and 42 were not physically communicated to the Audit Committee. Plaintiff asserts other documents prepared by Ten Eyck without a recipient listed on the privilege log are included in this testimony.

attorney's request to assist the attorney in providing legal advice to the client are protected by the attorney-client privilege.[17] *See Toler,* 2003 WL 21255039, at *5, 2003 U.S. Dist. LEXIS 8565 at *13.

After reviewing the documents, the Court finds that Ten Eyck created these documents in order to assist WGM in providing legal advice to the Audit Committee.[18] Therefore, these log entries are protected by the attorney client privilege unless otherwise waived.

### 5. Emails

■ This category of documents contain emails between or among: (1) members of WGM and members of Ten Eyck;[19] (2) WGM members;[20] (3) Ten Eyck members;[21] (4) Ten Eyck members and includes WGM members as recipients of the message;[22] (5) OMG employees and WGM or Ten Eyck;[23] (6) OMG employees and Ten Eyck and includes WGM members as recipients of the message;[24] (7) OMG employees and includes WGM members as recipients of the mes-sage;[25] and (8) Squire, Sanders & Dempsey, LLP members or Katten Muchin Zavis Rosenman members and WGM members or OMG employees.[26]

The first six categories and eighth category of emails are protected by the attorney-client privilege because these emails contain confidential communications made, at least in part, for the purpose of enabling WGM to counsel the Audit Committee. This is true even though these communications may contain information pertaining to business advice because the legal and business concerns are inextricably intertwined.

■ Further, the seventh category of emails, that is, communications between OMG employees are also protected. Although WGM did not actively participate in these OMG employee communications, counsel was indirectly involved because WGM members were recipients of the communications.

17. Further, in regard to Log Entry No. 35, the evidence reflects that the document was created help WGM counsel the client and provide the client with legal advice even though the document was not physically transmitted to the client. (Doc. No. 278, Exh. A., pp. 87–88.) In regard to Log Entry No. 39, the evidence is that the contents of the document were transferred to the client. (*Id.* at 89.)

18. Plaintiff asserts, by citing portions of Mr. Ferrillo's deposition, that WGM did not review firsthand the documents prepared by Ten Eyck to determine whether the documents were privileged. Plaintiff asserts that (1) WGM instead instructed Ten Eyck to make a list describing the documents it created relating to the investigation and (2) WGM logged these documents as privileged after reviewing the list. The Court finds that the attorney-client privilege nevertheless protects the documents prepared by Ten Eyck. WGM retained Ten Eyck to assist in the investigation. Ten Eyck provided confidential information regarding the investigation to WGM. Clearly, these communications are protected by the privilege. In line with this reasoning and to keep these communications protected, Ten Eyck's documents underlying the advice it provided to WGM have to be protected. Whether WGM reviewed such documents firsthand is inconsequential because it reviewed Ten Eyck's list. Moreover, in regard to the interview notes prepared by Ten Eyck, Mr. Ferrillo testified that he was present at most of those interviews.

19. This includes Log Entry Nos. 47, 56, 119, 119a, 119b, 119c, 120, 120a,121, 122, 122a, 122b, 125, 125b, 125c, 126, 128, 128a, 129, 130, 131, 132, 133, 134, 135, 136, 136a, 136b, 137, 137a, 137b, 137c, 137d, 137e, 138, 139, 140, 140a, 140b, 145, 146, 147, 148, 148c, 148d, 148e, 148f, 148g, 148h, 149, 150, 151, 152, 153, 153b, 153c, 153d, 153e, 153f, 153g, 154, 155, 156, 157, 159, 159a, 160c, 160d, 160e, 162, 162a, 162b, 163d, 163e, 182, 183, 185, 191a, 206, 225, 303, 306, 307, 308, 309.

20. This includes Log Entry Nos. 125a, 222 (handwritten note), 312, 315.

21. This includes Log Entry Nos. 40, 121a, 121b, 121c, 153a, 158, 179, 323, 330, 331.

22. This includes Log Entry Nos. 160, 160a, 160b.

23. This includes Log Entry Nos. 123, 163b, 163c, 164, 165, 169, 170, 173a, 183a, 174, 175, 176, 177, 180, 181, 187, 189, 190, 191, 193, 194, 311, 314.

24. This includes Log Entry Nos. 124, 127, 141, 161, 163, 163a, 166, 167, 184a, 186, 188, 192, 205, 282, 310, 320, 328.

25. This includes Log Entry Nos. 168, 171, 178, 184, 313.

26. This includes Log Entry Nos. 144, 148a, 148b, 169, 172, 173, 196, 333.

### 6. Statements prepared by OMG employees

■ This category of documents consist of statements prepared by OMG employees, *i.e.,* Log Entry Nos. 83, 84, 229, 299. Defendants have not shown that the OMG employees prepared these documents at the request of counsel for the purpose of obtaining legal advice. There is no indication that these documents were prepared for, or at the request of counsel. Therefore, the attorney-client privilege does not protect these documents. Defendants shall produce Log Entry Nos. 83, 84, 229, 299.

### C. Waiver of Attorney–Client Privilege

On March 15, 2004, WGM and Ten Eyck, on behalf of and at the direction of the Audit Committee, gave a Power Point presentation to OMG's Board of Directors regarding the findings of the ongoing investigation. (Affidavit of Paul Ferrillo, ¶ 7.) Defendants have produced to Plaintiff the Power Point presentation and two spread sheet prepared by Ten Eyck, but have not produced any of the underlying documents relating to, referred to, or relied upon, in the presentation. Plaintiff asserts that the Audit Committee waived its privilege to all documents underlying the Power Point presentation and two spreadsheets regarding the investigation when it produced the presentation and spreadsheets to Plaintiff. Plaintiff further contends that: (1) the presentation refers to, paraphrases, quotes, or is based upon certain privileged documents such as the interview notes of OMG employees; (2) the presentation and the spreadsheets [27] provided detailed analysis gathered by the Audit Committee / WGM, and Ten Eyck regarding the inventory issues; and (3) Defendants waived any privilege over the documents containing the same subject matter as the presentation. It is not entirely clear whether Plaintiff is seeking all documents gathered and generated by the Audit Committee throughout its entire investigation, or only those documents in existence at the time of the Power Point presentation on March 15, 2004.

Initially, Defendants assert that production of the Power Point presentation did not waive the Audit Committee's privilege to all documents generated or gathered during its entire investigation because the Power Point presentation only reflected a preliminary view reached after the first three months of a nine month investigation. Thus, Defendants argue the Power Point presentation was not a significant part of the investigation and its disclosure did not waive the attorney client privilege to the entire investigation. Defendants further allege that Ten Eyck's spreadsheets were an insignificant part of the investigation because they were limited to discrete aspects of the firm's work, *i.e.,* annual analysis of supportable vs. currently unsupportable adjustments and analysis of annual P & L understatement/overstatement. Defendants also appear to argue that the privilege in documents underlying the Power Point presentation was not waived because the report merely summarized findings and conclusions and did not disclose a "significant part" of the investigation. Finally, Defendants argue the scope of any waiver should be narrowly construed because Defendants will not gain an unfair tactical advantage by the partial release of the Audit Committee's investigative results, that is, the Power Point presentation and the two spreadsheets.

■ The Defendants bear the burden of establishing both the existence of the privilege and the non-waiver of the privilege. *See e.g., In re VisionAmerica, Inc.,* 2002 WL 31870559, at *2, n. 2 (W.D.Tenn. December 18, 2002). The voluntary disclosure of purportedly privileged material is inconsistent with an assertion of the privilege. *In re Grand Jury Proceedings October 12, 1995* ("*Grand Jury Proceedings*"), 78 F.3d 251, 254 (6th Cir.1996) citing *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3rd Cir.1991). Courts examine whether there has been a disclosure of a "significant part" of a privileged communication to determine if the privilege, in fact, has been waived. *See In re Perrigo Co.,* 128 F.3d 430, 438 (6th Cir.1997); *Grand Jury Proceedings,* 78 F.3d at 254–5. If the court

**27.** Plaintiff further asserts that the spreadsheets correspond to the presentation by quantifying the

OMG's unsupported inventory balances by year, facility, and inventory type.

concludes the privilege has been waived, it must then determine the scope of the waiver. The waiver applies to the rest of the communications on the same subject matter. *Grand Jury Proceedings,* 78 F.3d at 255. The subject matter of the waiver can be defined broadly or narrowly. *Id.* Ultimately, the scope of the waiver must be based upon the facts of each case; and the court must be guided by fairness concerns.

*Grand Jury Proceedings* is instructive. In that case, the Sixth Circuit reviewed a district court's order compelling an attorney to testify before the grand jury concerning legal advice given to the owner and president of a laboratory about a marketing plan for nursing home business. During the course of an investigation, government agents met with the president and owner of the laboratory who informed the agents that they had met with an attorney who specialized in Medicare law. They also informed the agents of the attorney's name, told them they took the laboratory's twenty-four point marketing plan to the attorney and described the various elements of the plan to the attorney in detail. The president and owners told the agents about the advice the attorney had given them with regard to two specific points of the plan. The district court had ordered the attorney to testify with respect to all twenty-four points of the plan. The Sixth Circuit held that the laboratory's president and owner had waived any privilege with regard to the specific elements of the marketing plan by disclosing the attorney's advice to the government agents, but reversed the district court's ruling with regard to the remaining elements of the plan because it was not clear whether those elements involved the same subject matter. After reviewing the evidence before it, the Sixth Circuit explained:

[W]e conclude that they probably did not divulge the substance of the attorney's advice on the entire marketing plan. They only informed the investigators about the attorney's advice on providing nursing homes free supplies to test patients' insulin levels and on billing Medicare for tests performed by nursing home personnel. Indeed, the Government's attorney repeatedly questioned the investigator about whether the owner and president had told the investigators anything about the attorney's advice with respect to the remaining twenty-two points of the plan. On each occasion, the investigator testified that the owner and president had not revealed anything about the attorney's advice regarding the remaining marketing points.

We do not have the marketing plan before us, and so we cannot know how advice on the specific points might be inextricably linked with the advice on the entire twenty-four point marketing plan. But we do not believe that the owner and president's waiver of the privilege by divulging the attorney's advice on several specific items of the marketing plan necessarily constitutes waiver as to the attorney's advice on the entire plan.

*Id.* at 255.

■■■ In the case at bar, there can be no reasonable dispute that Defendants waived any privilege in the Power Point presentation and the two spreadsheets. These documents were not brief or cryptic summaries; nor did they merely acknowledge the existence of an investigation.[28] These documents contained significant disclosures. The Power Point presentation, although containing preliminary findings, was a substantial presentation of the investigation up to that time, was more

28. On this issue, the cases of *In re Dayco Corp. Deriv. Sec. Litig.,* 99 F.R.D. 616, 619 (S.D.Ohio 1983) and *In re VisionAmerica, Inc. Sec. Litig.,* 2002 WL 31870559 (Dec. 18, 2002) (W.D.Tenn.) cited by Defendants are inapposite. In *Dayco,* the court found that a two-page press release that failed to summarize evidence found in an investigative report, did not release a significant portion of the investigative report; and, therefore the contents of the entire report were not waived. In this case, the entire report was disclosed and it revealed detailed support for the conclusions contained in the report. In *VisionAmerica,* the party asserting a waiver had obtained purportedly abandoned documents from a bankruptcy proceeding that merely acknowledged the performance of an investigation but did not contain any facts underlying, or findings of, the investigation. The court held that the mere acknowledgment that an attorney-client privileged investigation was performed and that a report was made is insufficient, as a matter of law, to waive the privilege.

than 30 pages in length, listed detailed conclusions and cited specific findings, interviews and documents in support. By way of example, it described the reason for the origination of the Audit Committee's inventory review, directly quoted concerns and observations about the inventory set forth in e-mails by identified individuals, summarized the content of specific e-mails, identified more than ten persons interviewed in connection with the investigation, discussed the scope of the document review and difficulties encountered in obtaining appropriate documentation, set forth a number of points as to whether there was a basis for top-side adjustments to work in progress at a particular facility, discussed the results of interviews with plant personnel and conclusions resulting therefrom, and set forth investigative results. Moreover, the entire presentation included inventory analysis and spreadsheets prepared by Ten Eyck. The spreadsheets correspond to the presentation by quantifying OMG's unsupported inventory balances by year, facility and inventory type. The Board considered this information in connection with its issuance of a press release the following day stating OMG anticipated a restatement of its earnings. This disclosure is far more than a cursory summary, a brief press release or a mere acknowledgment that an investigation exists. Accordingly, the disclosure waived the privilege with regard to the preliminary investigation.

 Thus, this Court must determine the scope of the waiver. The appropriate inquiry to determine the scope of the waiver is whether the client's disclosure involves the same subject matter as the information sought. See U.S. v. Collis, 128 F.3d 313, 320 (6th Cir.1997); see also In re Grand Jury Proceedings October 12, 1995, 78 F.3d 251, 254 (6th Cir.1996). Documents that have not been disclosed initially, but otherwise relate to the same subject matter of the litigation as those "privileged" documents that have been disclosed, may be subject to waiver. In re Grand Jury, 78 F.3d at 256.

In support of subject matter waiver, Plaintiff relies on In re Leslie Fay Cos., Inc. Securities Litigation, 161 F.R.D. 274, 280–81 (S.D.N.Y.1995) and In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher ("Willkie Farr"), 1997 WL 118369, 1997 U.S. Dist. LEXIS 2927 (S.D.N.Y.1997). In Leslie Fay, the board of director's audit committee retained counsel, who in turn retained accountants, to assist in conducting an investigation regarding accounting irregularities. Leslie Fay, 161 F.R.D. at 277. The court ruled that the corporation's production of the audit committee's report to the SEC waived the attorney-client privilege. Id. at 278. After the disclosure to the SEC, the plaintiff sought documents underlying the report prepared by counsel and the accountants. Id. at 279. The court found that the production of the report to the SEC waived the attorney-client privilege to interview notes and data underlying the report. Id. at 284.

In Willkie Farr, the board of director's audit committee retained counsel to conduct an investigation regarding accounting irregularities. Willkie Farr, 1997 WL 118369 at *1, 1997 U.S. Dist. LEXIS 2927 at *2–3. Counsel in Willkie Farr conducted interviews and, subsequently, orally paraphrased statements of employee interviews to the corporation's independent auditor to enable the auditor to issue an unqualified audit opinion. The plaintiff in Willkie Farr sought the documents related to the investigation. Id. at *2, 1997 U.S. Dist. LEXIS 2927 at *4. The court held that the defendant waived its privilege as to the employee interview notes. Id. at *4, 1997 U.S. Dist. LEXIS 2927 at *11.

Defendants counter that the courts in both Leslie Fay and Willkie Farr applied the fairness doctrine in analyzing subject matter waiver. The court in Leslie Fay found that upholding counsel's claim of privilege would substantially prejudice the corporation's former independent auditor at trial because the report's conclusions exonerated the corporation's senior management and tended to implicate the outside auditors in the alleged fraudulent scheme. Leslie Fay, 161 F.R.D. at 283. The court in Leslie Fay also stated that denying the auditor access to the documents underlying the report would significantly impair the auditor's ability to defend itself against charges of impropriety because many upper management officials likely would take the Fifth Amendment and recre-

ation of the work underlying the report years after the alleged fraud would be almost impossible. *Id.* at 283.

Similarly, the court in *Willkie Farr* found that the corporation used the privilege as "both a sword and shield in litigation" when it used the auditor's report (that was derived from the privileged material) in support of its motion to dismiss the complaint, but asserted privilege as a basis for not disclosing the report to the opposing side. *Willkie Farr,* 1997 WL 118369 at *3–4, 1997 U.S. Dist. LEXIS 2927 at *10–11.

■ In the instant action, Defendants assert that they have not used, nor will use, the underlying documents for a tactical advantage in the litigation. Defendant claims that, unlike the documents in *Leslie Fay,* the presentation and underlying documents do not exonerate OMG or accuse an outside party of wrongdoing. Further, Defendants claim that, unlike counsel in *Willkie Farr,* OMG did not disclose snips and quotes of employee interviews from the underlying documents to a third party in order to obtain an unqualified audit opinion. These arguments are unavailing. Defendants attempt to restrict application of the fairness doctrine solely to whether they would gain a tactical advantage in litigation by not disclosing the underlying documents.[29] The Court does not interpret the fairness doctrine so narrowly. The Court must consider, not only whether there is a tactical benefit, but whether it is fair to uphold the privilege considering the nature of the disclosure.[30] Here, the Court finds that the Audit Committee's disclosure of the presentation would make it unfair to protect the documents underlying the presentation. The disclosure to OMG's Board was substantial, intentional, and deliberate. The presentation was thirty pages, with many pages having three or four bullets of the investigation's findings. The presentation cited and

quoted numerous interviews of OMG employees conducted by WGM and/or Ten Eyck during the investigation. Along with the presentation, Defendants also disclosed two spreadsheets and charts listing inventory and dollar amounts. This was not a report merely setting forth conclusions the investigation revealed up to that point. It was a detailed formal, oral presentation relying upon specific information.

The underlying documents clearly are within the scope and subject matter of the Audit Committee's intentional disclosure. There is no reason Defendants, who voluntarily disclosed substantial information about an investigation that led to a public announcement that OMG anticipated a restatement of earnings, should now be able to withhold information that would allow Plaintiff to review the whole picture. For these reasons, Plaintiff is entitled to the documents relating to and/or underlying the presentation. Specifically, Defendants waived, and shall disclose to Plaintiff all documents in existence at the time of the Audit Committee's presentation to the Board of Directors that address the following topics presented in the Power Point presentation:

1. the work-in process inventory, in-transit/resupply inventory, full absorption costs, and "other issues" at the Franklin Facility, including all interviews referenced and relied on for this topic, *see* Presentation, pp. OMG1626686–92;

2. the estimated value of inventory at the St. George Facility, *see* Presentation, pp. OMG1626693–96;

3. the double-counting of full-absorption costs at the Midland Facility, *see* Presentation, pp. OMG1626697;

4. the absence of pounds of any material or product associated with the book inventory as of late 2002 at the Tacow Facility,

**29.** Even if the Court were to adopt Defendants' narrow interpretation of the fairness doctrine, the Court lacks any basis for determining, at this point, whether Defendants will use the underlying documents in the litigation or gain any tactical advantage.

**30.** In stating that courts must be guided by fairness concerns in determining the scope of the waiver, the Sixth Circuit cited two cases. *See In*

*re Grand Jury Proceedings,* 78 F.3d at 256. Although the Sixth Circuit relied upon a case finding a privilege is not waived to undisclosed portions of a communication if the disclosure is not used to the adversary's prejudice, it also relied upon a case finding that waiver of a privilege occurs when actions by the holder would make it unfair to insist that the privilege exists. *Id.*

including all interviews referenced and relied on for this topic, *see* Presentation, p. OMG1626698;

5. The additional capitalization of direct costs and overhead and "other issues" at the Kokkola and Harjavalta Facilities, including all interviews referenced and relied on for this topic, *see* Presentation, pp. OMG1626699–707.

To the extent Plaintiff suggests that Defendants waived their privilege to all documents pertaining to the entire investigation that relate to a restatement of earnings, even including documents generated after the March 15, 2004 meeting, the argument is not well taken. The Court does not construe subject matter waiver this broadly. The Audit Committee's investigation continued after the initial presentation; it is likely the Audit Committee developed new confidential and privileged information. The Court narrowly construes the scope of the waiver to be limited to information developed in the preliminary stage of the investigation. There is no evidence of any intent by the Audit Committee to waive its privilege to future information. There is no just reason to extend the waiver to information that was not even in existence at the time of disclosure. Accordingly, the Court finds that Defendants waived the attorney-client privilege only to the documents prepared on or before March 15, 2004 relating to, referred to, and/or relied upon for the Audit Committee's Power Point presentation.

### III. Missing Documents

Defendants initially submitted the Privilege Log documents with approximately thirty-one of the documents missing. Although Defendants have submitted some of the missing documents since that time, eight documents are still missing or have not been submitted to the Court, *i.e.*, Log Entry Nos. 69, 70, 72, 82, 86, 109, 142, 143. Within 14 days of this order, Defendants shall make a diligent effort to find these documents and submit them to the Court or show cause why they have not been disclosed.

### IV. Conclusion

For the foregoing reasons, Plaintiff's Motion to Compel (Doc. No. 254) is GRANTED in part and DENIED in part.

Specifically, all of the Log Entries are protected by the attorney-client privilege, unless otherwise waived, except for Log Entry Nos. 83, 84, 229, 299. The work-product doctrine does not protect any of the Log Entries. Therefore, Defendants shall produce to Plaintiff Log Entry Nos. 83, 84, 229, 299. Further, Defendants shall produce Log Entry Nos. 16, 100, and 255 because Defendants only asserted the work-product doctrine to these documents. Defendants waived the attorney-client privilege to, and shall disclose to Plaintiff, all documents in existence at the time of the Audit Committee's presentation to the Board of Directors that address the following topics:

1. the work-in process inventory, in-transit/resupply inventory, full absorption costs, and "other issues" at the Franklin Facility, including all interviews referenced and relied on for this topic, *see* Presentation, pp. OMG1626686–92;

2. the estimated value of inventory at the St. George Facility, *see* Presentation, pp. OMG1626693–96;

3. the double-counting of full-absorption costs at the Midland Facility, *see* Presentation, pp. OMG1626697;

4. the absence of pounds of any material or product associated with the book inventory as of late 2002 at the Tacow Facility, including all interviews referenced and relied on for this topic, *see* Presentation, p. OMG1626698;

5. The additional capitalization of direct costs and overhead and "other issues" at the Kokkola and Harjavalta Facilities, including all interviews referenced and relied on for this topic, *see* Presentation, pp. OMG1626699–707.

IT IS SO ORDERED.