# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Center Partners, Ltd. v. Growth Head GP, LLC,*  2012 IL 113107

---

| | |
|---|---|
| Caption in Supreme Court: | CENTER PARTNERS, LTD., *et al.*, Appellees, v. GROWTH HEAD GP, LLC, *et al.*, Appellants. |
| Docket Nos. | 113107, 113128 cons. |
| Filed | November 29, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The doctrine of subject matter waiver did not apply to disclosures which were otherwise protected by the attorney-client privilege where they were made in an extrajudicial context and were not thereafter used to gain a tactical advantage in the litigation—motion to compel production reversed. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Charles R. Winkler, Judge, presiding. |
| Judgment | Judgments reversed.<br>Cause remanded. |

Counsel on
Appeal

Gino L. DiVito, Karina Zabicki DeHayes, Brian C. Haussmann and John M. Fitzgerald, of Tabet DiVito & Rothstein LLC, of Chicago (John S. Kiernan, Carl Riehl and William H. Taft V, of Debevoise & Plimpton LLP, of New York, New York, of counsel), for appellants Westfield *et al*.

Lynn H. Murray, Laura K. McNally, Pei Y. Chung and Claudia M. Rustad, of Grippo & Elden LLC, of Chicago, and David Lender and Jason Bonk, of New York, New York, and Thomas C. Frongillo, of Boston, Massachusetts, all of Weil, Gotshal & Manges LLP, for appellants The Rouse Company *et al*.

Jeffrey L. Willian, Alyssa A. Qualls and S. Maja Fabula, of Kirkland & Ellis LLP, Michael A. Pollard, of Baker & McKenzie LLP, and Kevin M. Forde, all of Chicago, for appellees.

Hinshaw & Culbertson LLP, of Chicago (Stephen R. Swofford, Thomas P. McGarry and Nabil G. Foster, of counsel), for *amici curiae* Illinois State Bar Association *et al*.

Andrew Kopon Jr., Mollie E. Werwas and Stacy M. Kramer, of Kopon Airdo, LLC, and Michael Resis, of SmithAmundsen LLC, all of Chicago, and Mary-Christine Sungaila, of Snell & Wilmer L.L.P., of Costa Mesa, California, for *amici curiae* International Association of Defense Counsel and Illinois Association of Defense Trial Counsel.

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Karmeier, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1    Defendants appeal from a circuit court of Cook County order that granted plaintiffs' motion to compel the production of certain documents containing privileged attorney-client communications.[1] Defendants refused to comply with the court's order to compel production

---

[1]There are numerous parties in this case, and referring to all the parties by name would be onerous and confusing. The parties are as follows. Defendants: Growth Head GP, LLC, Westfield America Limited Partnership, Westfield America, Inc., Westfield America Trust, Rouse-Urban,

of documents and were found in contempt. Defendants appealed pursuant to Supreme Court Rule 304(b)(5) (eff. Feb. 26, 2010). The appellate court affirmed the granting of the motion to compel. 2011 IL App (1st) 110381. Defendants have appealed to this court, arguing the subject matter waiver doctrine should not apply to compel production of undisclosed, privileged communications where the disclosed communications were extrajudicial in nature and were not used to gain an advantage in litigation. This court granted leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We have allowed the Illinois State Bar Association, Association of Corporate Counsel, Association of Corporate Counsel Chicago Chapter, the International Association of Defense Counsel, and Illinois Association of Defense Counsel to file *amicus curiae* briefs pursuant to Supreme Court Rule 345 (Ill. S. Ct. R. 345) (eff. Sept. 20, 2010). For the following reasons, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court.

¶ 2                                    BACKGROUND

¶ 3        Defendants are independent real estate companies that own and operate retail shopping malls throughout the United States. In late 2001 and early 2002, defendants Westfield, Rouse, and Simon negotiated to jointly purchase the assets of a Dutch company, Rodamco North America, N.V. (Rodamco). Among the assets purchased with the acquisition of Rodamco was Urban Shopping Centers, L.P. (Urban), an Illinois limited partnership that owns high-end retail shopping centers across the United States. Defendants acquired a large majority interest in Urban, including full ownership of Head Acquisitions, L.P. (Head), Urban's general partner. Plaintiffs are minority limited partners in Urban.

¶ 4                              The Business Negotiations

¶ 5        Defendants entered into a purchase agreement with Rodamco in January 2002. On the same day, defendants entered into a separate joint purchase agreement with one another that concerned the allocation of Rodamco's assets and the share of the purchase price each of

---

LLC, TRCGP Inc., The Rouse Company, L.P., The Rouse Company, Rouse LLC, GGP L.P., General Growth Properties, Inc., Urban Shopping Centers, L.P., Head Acquisition L.P., SPG Head GP, LLC, Simon Property Group, LP, and Simon Property Group, Inc. Urban Shopping Centers, L.P., Head Acquisition L.P., SPG Head GP, LLC, Simon Property Group, LP, and Simon Property Group, Inc. do not appeal from the circuit court's order on the motion to compel.

     Plaintiffs are Center Partners, Ltd., Urban-Water Tower Associates, Miami Associates, L.P., and Old Orchard Limited Partnership, all Illinois limited partnerships, individually and derivatively on behalf of Urban Shopping Centers, L.P.

     We adopt the approach taken by the appellate court and will refer to plaintiffs simply as "plaintiffs." We will refer to defendants as "defendants," except where necessary to make the distinction we will refer to "defendant Westfield" (Westfield America Trust, Westfield America Inc., Westfield America Limited Partnership and Growth Head GP, LLC), "defendant Rouse" (Rouse-Urban LLC, TRCGP, Inc., The Rouse Company, LP, The Rouse Company, Rouse LLC, GGP LP, and General Growth Properties, Inc.), and "Simon" (Simon Property Group, LP, and Simon Property Group, Inc.).

them would pay. The purchase of Rodamco closed in May 2002. When the purchase closed, defendants executed an amended Head partnership agreement that included provisions allocating control over Urban's numerous mall interests amongst themselves. Plaintiffs were not a party to the Rodamco purchase transaction or to the negotiations leading up to it.

¶ 6        During the course of the negotiations leading up to the purchase of Rodamco, defendants discussed legal issues in negotiating the transaction's terms. They also disclosed to each other some of their attorneys' views about the legal implications of the transaction, the legal importance of the documents under negotiation, and the rights and obligations of the parties to the transaction. Defendants also shared with one another some documents that concerned the legal and financial terms of the transaction. Additionally, defendants' attorneys discussed with one another the terms for a new partnership agreement concerning Urban's mall interests. In these discussions, attorneys for Westfield, Rouse, and Simon shared with each other their legal concerns and legal conclusions about the structure of a new partnership agreement and how it would operate. This new partnership arrangement has been referred to in this litigation as the "synthetic partnership."

¶ 7                        The Underlying Lawsuit

¶ 8        Plaintiffs first brought suit in 2004, alleging that, since purchasing Head, defendants had breached alleged fiduciary and contractual duties they owed to Urban and plaintiffs (as limited partners of Urban). Plaintiffs alleged that defendants' division of responsibility for Urban's mall interests under the "synthetic partnership" was a breach of defendants' alleged duties and deprived Urban of sufficient corporate opportunities.

¶ 9        At the heart of plaintiffs' claim is the Urban partnership agreement. Urban was founded to hold, manage, and grow a portfolio of shopping centers then owned by JMB Realty Corporation. In 1993 Urban went public, and by 2000 had become an industry leader in operating, managing, and developing regional malls. In late 2000 Rodamco bought Urban's outstanding shares and took the entity private. Plaintiffs continued to own units as Urban's limited partners. Head, a Rodamco subsidiary, became Urban's new general partner. Rodamco negotiated a partnership agreement with Urban's limited partners (including plaintiffs). The Urban partnership agreement defines the rights, obligations, and liabilities of Head as general partner, as well as the rights and responsibilities of the limited partners. It is plaintiffs' contention that the "[a]greement reflects an intent to grow Urban through the acquisition and development of additional properties." The agreement does not permit Head or its affiliates to compete with Urban in business opportunities, such as acquiring additional real estate, attracting joint venture partners to acquire properties, or developing properties.

¶ 10      Plaintiffs alleged that defendants received legal advice on how to structure a "synthetic partnership," so as to evade the contractual terms and avoid the legal and fiduciary obligations they owed as Urban's general partner. Plaintiffs claimed defendants allocated Urban's properties among themselves, stopped growing Urban's business through acquisitions or ground-up developments, disregarded partnership agreement terms, and stole Urban's opportunities for themselves.

¶ 11	The Motions to Compel

¶ 12	In 2008 plaintiffs filed their first motion to compel the production of privileged communications. Plaintiffs noted that, on the privilege log filed by defendants, one defendant had purposely disclosed privileged documents to another defendant. Plaintiffs sought the compelled production of documents that defendants had shared among themselves. Defendants objected, arguing that the sought-after documents were protected by the common interest doctrine, and were thus privileged. The circuit court, on December 10, 2008, granted plaintiffs' motion to compel, finding that certain documents containing legal advice could be produced on the ground that defendants had waived any assertion of privilege by sharing the information amongst themselves. The court, however, was careful to limit its order to only those documents that had been disclosed. The court wrote:

> "Further, with regard to the documents to be produced as identified on Appendix B, defendants may redact the contents of any email in an email string if that communication with defendant's counsel was not circulated to any other defendant or third party."

¶ 13	Following the production of the documents, the parties conducted further discovery, including depositions of defendants' executives. In March 2009 plaintiffs filed a second motion to compel, arguing, specifically, that defendant Westfield improperly directed Westfield witness Mark Stefanek, Westfield's chief financial officer, not to testify about matters as to which he had waived the attorney-client privilege. Plaintiffs claimed that Westfield attorneys permitted Stefanek to testify to the actual legal advice received from counsel, but then refused to allow him to testify about the rationale and other details of the legal advice. Plaintiffs argued that this "selective and offensive invocation of the attorney-client privilege waive[d] the privilege regarding the subject matter about which he voluntarily testified—his belief that Westfield had no duty to consider new business opportunities for Urban." The circuit court denied the motion.

¶ 14	Plaintiffs filed a third motion to compel, the motion at issue in this appeal, in April 2010, seeking over 1,500 documents identified in defendants' privilege logs. In the third motion to compel, plaintiffs accused defendants of breaching their fiduciary duties to Urban by usurping business opportunities, in violation of the Urban partnership agreement. Plaintiffs alleged that, during depositions, defendants' witnesses confirmed that during the business negotiations in 2001-02 each defendant's individual counsel attended negotiating sessions and discussed with nonclients legal advice regarding: (1) acquisition structure and use of a "synthetic partnership" to avoid certain partnership obligations; and (2) liability and obligations as Urban's general partner, including continuing obligations to acquire and develop additional properties through Urban. Plaintiffs specifically pointed to the deposition testimony of defendants' witnesses, including arguments concerning the testimony of Stefanek that had been raised in the prior motion to compel, to support compelled production of the requested documents.

¶ 15	Plaintiffs first contended that Anthony Deering, defendant Rouse's former chief executive officer, testified to privileged attorney-client discussions during his deposition. During the January 12, 2010, deposition, plaintiffs' attorney asked Deering if he ever

conferred with anyone at Rouse as to whether Rouse had a duty to consider putting new acquisitions within Urban. Rouse's deposition counsel objected, as it called for a legal conclusion, and cautioned Deering not to disclose any attorney-client communications about that issue he may have had at the time. Deering could otherwise answer the question. Deering testified that he had consultations with the other defendants' officers and outside counsel about structuring the partnership. Plaintiffs' attorney asked Deering if he had received legal advice, to which Deering responded "yes." At that point, one of Rouse's attorneys intervened, and informed Deering that any communication his attorneys had with him, in the presence of Simon and Westfield, could be disclosed. However, the Rouse attorney instructed Deering that any legal advice his attorney gave to him in private should not be disclosed. Plaintiffs' attorney then asked Deering what the legal rationale was for Deering's conclusion that Rouse had no duty, after the transaction was complete, to put new acquisitions within Urban. Rouse's attorney again cautioned Deering that it was acceptable to disclose communications he had with his attorney when people from Simon and Westfield were present, but private, privileged communications should not be disclosed. Deering answered plaintiffs' question, saying that his attorney did not give a synopsis of why the synthetic partnership structure worked, but did outline the structure and assured defendants that it would be acceptable and sustainable. Plaintiffs' attorney later again asked Deering what the basis was for his understanding that, after the closing of the Rodamco transaction, Rouse did not feel it had a duty to put new acquisitions within Urban. After again being warned by counsel to be cognizant of not disclosing attorney-client communications, Deering testified that the synthetic partnership insulated Rouse from having to do anything extraordinary in terms of presenting corporate opportunities, acquisitions or any other deals to Urban. That understanding was based on advice given to him at the time by Rouse's attorney, and was given in front of representatives from Simon and Westfield.

¶ 16   Plaintiffs next cited to the testimony of Robert Minutoli, a former Rouse vice president. Minutoli confirmed during the January 28, 2010, deposition that he discussed the substance of legal advice he received with representatives from Simon and Westfield concerning the synthetic partnership. Minutoli was warned by his counsel not to discuss anything that was covered by attorney-client privilege. Plaintiffs' attorney asked if he could recall any aspects of the rationale for the advice that defendants could buy the Urban partnership yet leave behind certain provisions of the partnership agreement with a liquidating entity. After objections from Rouse's counsel, Minutoli answered that it was his recollection that Rouse was in full compliance with the partnership agreement.

¶ 17   Plaintiffs, in the third motion to compel, also cited to the January 7, 2009, deposition testimony of Westfield chief financial officer Mark Stefanek. Plaintiffs' attorney asked Stefanek what basis he had for believing there was no duty to consider business opportunities for Urban. Over the objection of counsel, Stefanek answered his belief was based on legal advice from Westfield's attorneys. Plaintiffs' counsel then asked what the basis was for Westfield's attorneys' legal advice that Westfield had no duty to put any new business opportunities before Urban. Westfield's attorney at the deposition objected and instructed Stefanek not to answer. The following exchange then occurred:

"[Plaintiffs' counsel]: Well, he's already testified to the legal advice. I take it you

are waiving, right, privilege?

[Westfield's counsel]: No, we are not waiving.

[Plaintiffs' counsel]: Well, you let him testify to the legal advice.

[Westfield's counsel]: I have—you—I have given my instruction. You can proceed."

¶ 18       Plaintiffs' counsel then told Stefanek that he was only asking his basis for his belief as a businessman, not legal advice. Stefanek testified that he believed that, while Westfield had a duty on behalf of Urban to consider new business opportunities for Urban in the form of existing redevelopments on existing Urban properties, it did not have a duty to consider new acquisitions on behalf of Urban. Plaintiffs' counsel then asked if this understanding was based on legal advice from Westfield's counsel, to which Westfield's deposition counsel objected. Later in the deposition, plaintiffs' counsel asked the same question, to which there was another objection. Plaintiffs' attorney later asked Stefanek if it was "logical" to think that legal advice was shared between defendants, leading to this exchange:

"[Stefanek]: Well, we all signed it, so it would seem pretty logical that—you know, that—that anything significant would have been discussed with everybody, yes.

[Plaintiffs' attorney]: Again, I think that's—there's been a waiver in light of the court's prior ruling on that, [Westfield's attorney], and did you want to reconsider your advice to instruct him not to answer that?

[Westfield's attorney]: What's your question?

[Plaintiffs' attorney]: I would like to know what the legal advice was.

[Westfield's attorney]: If—if—as the—what—if—do you mind asking the foundational question, whether he knows what the legal advice that was shared was?

[Plaintiffs' attorney]: You received legal advice on why Simon, Rouse and Westfield believed they could exclude certain provisions of the Urban partnership agreement. Correct?

[Stefanek]: I received advice what—based on why we could.

[Plaintiffs' attorney]: Okay. And you believe that it's logical that advice was shared with the other partners, Simon and—Rouse? Is that correct?

[Stefanek]: Seems logical that it would be, yes."

¶ 19       In the third motion to compel plaintiffs argued that defendants could not have it both ways, and having disclosed legal advice on these subjects with each other outside of any confidential relationship in 2001-02, they could not in litigation object that advice on those same subjects is privileged. Plaintiffs also accused defendants of disclosing "tid-bits" to plaintiffs that "act as a sword, while asserting privilege as a shield as to other materials on these same subjects." Plaintiffs contended that any privilege regarding legal advice on the Rodamco acquisition structure and the "synthetic partnership" had been waived when Rouse's witnesses testified that the structure was created by Rouse attorneys who relayed their legal analyses and conclusions to Simon and Westfield and their attorneys. Plaintiffs requested the production of all documents relating to the Rodamco acquisition structure and

"synthetic partnership." Plaintiffs also claimed that the attorney-client privilege regarding legal advice on obligations and liabilities to Urban's general partners had been waived, since witnesses for defendants testified defendants and their attorneys freely shared legal advice on this subject matter with each other. Plaintiffs requested the production of all documents defendants had withheld regarding the Urban partnership agreement.

¶ 20 Defendants argued in response that they had not intentionally waived the attorney-client privilege by asserting the advice of counsel as a defense or otherwise placing privileged communications at issue in the litigation, and that the disclosure of even privileged attorney-client communications in a business negotiation does not as a matter of law result in a "subject matter waiver" of all other undisclosed communication a party has with its attorney. The circuit court asked defendants to submit the documents requested by plaintiffs for an *in camera* review, informing the parties it could not make a decision on the motion to compel without first looking at the requested documents. In October 2010, the circuit court granted the motion to compel, finding that since "[d]efendants had shared privileged communications it follows that the subject of those communications is susceptible to discovery." The court rejected defendants' motion to reconsider. Defendant Westfield's counsel advised the circuit court that Westfield would not produce the documents to plaintiffs and asked to be held in "friendly contempt." The court entered a contempt order against Westfield. Westfield and Rouse appealed separately from the court's order compelling disclosure of the requested documents and communications.[2]

¶ 21 The Appellate Court Ruling

¶ 22 The appellate court affirmed the circuit court's ruling on the motion to compel. The appellate court held that when, in 2001 and 2002, defendants "disclosed privileged attorney-client communications among one another regarding the purchase of Rodamco and specifically the acquisition of Head, those disclosures resulted in a subject-matter waiver of all privileged communications regarding the purchase." 2011 IL App (1st ) 110381, ¶ 15. Concerning defendants' argument that prior Illinois cases on subject matter waiver were inapplicable to the instant case because those disclosures occurred in the context of litigation rather than a business transaction, the court wrote, "[W]e find no reason to distinguish between a waiver occurring during the course of litigation or during a business negotiation." 2011 IL App (1st) 100381, ¶ 16. The appellate court also rejected defendants' arguments that the scope of the waiver was excessive, concluding that, because defendants have the burden of proving the existence of the privilege, defendants had the burden of pointing out the excessive rulings, with specificity as to each document, and they had not done so.

¶ 23 ANALYSIS

¶ 24 On appeal, defendants contend that the subject matter waiver doctrine only applies when privileged attorney-client communications are disclosed during litigation for the purpose of

---

[2]Simon did not appeal the circuit court order. Simon is not a party to the appeal in this court.

achieving an advantage in that litigation. Defendants argue that, in the instant case, the privileged communications were disclosed only during business negotiations, and thus the subject matter waiver does not apply to compel production of undisclosed, privileged attorney-client communications. Plaintiffs respond that subject matter waiver applies when certain previously privileged communications are disclosed, regardless of whether the disclosure occurred during litigation or in an extrajudicial context. In the alternative, plaintiffs argue that defendants, during their deposition testimony, disclosed privileged communications so as to gain a tactical advantage in this litigation, justifying application of the subject matter waiver doctrine.

¶ 25                    I. Application of the Subject Matter Waiver Doctrine
                              to Extrajudicial Disclosures

¶ 26    The first question this court must answer is whether, as a matter of law, the subject matter waiver doctrine applies to the disclosure of privileged statements made outside of a litigation or judicial setting, *i.e.*, in an "extrajudicial" setting. Illinois courts have not previously been confronted with the question of extending the subject matter waiver doctrine to extrajudicial settings. Therefore, the question is one of first impression in this court.

¶ 27    The issue of whether the subject matter waiver doctrine extends to extrajudicial disclosures is a question of law concerning the application of privilege rules in discovery, and thus is reviewed *de novo*. *Norskog v. Pfiel*, 197 Ill. 2d 60, 71 (2001) ("In this appeal, we are deciding whether disclosure of mental health information is prohibited by a statutory discovery privilege and whether any exception to the privilege applies. These are matters of law subject to *de novo* review.").

¶ 28                    A. *The Attorney-Client Privilege in Illinois*

¶ 29    Before directly addressing the application of subject matter waiver in extrajudicial settings, some discussion of the attorney-client privilege is necessary. Our court rules govern disclosure of privileged material and work product during discovery. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 189 (1991). Supreme Court Rule 201(b)(2) states:

"(2) *Privilege and Work Product.* All matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure. Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney. The court may apportion the cost involved in originally securing the discoverable material, including when appropriate a reasonable attorney's fee, in such manner as is just." Ill. S. Ct. R. 201(b)(2) (eff. July 1, 2002).

¶ 30    Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected

from disclosure by the client or lawyer, unless the protection is waived. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000); *People v. Simms*, 192 Ill. 2d 348, 381 (2000); *People v. Adam*, 51 Ill. 2d 46, 48 (1972); 8 John Henry Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961). "The attorney-client privilege is an 'evidentiary privilege [which] provides limited protection to communications from the client by prohibiting their unauthorized disclosure in judicial proceedings.' " *In re Marriage of Decker*, 153 Ill. 2d 298, 312 (1992) (quoting Annotated Model Rules of Professional Conduct R. 1.6, at 90 (2d ed. 1992)). The privilege is one of the oldest privileges for confidential communications known to the common law and "has been described as being essential 'to the proper functioning of our adversary system of justice.' " *Decker*, 153 Ill. 2d at 312-13 (quoting *United States v. Zolin*, 491 U.S. 554, 562 (1989)). The privilege is based upon the confidential nature of the communications between the lawyer and client. *Simms*, 192 Ill. 2d at 381.

¶ 31    " 'The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information.' " *Waste Management*, 144 Ill. 2d at 190 (quoting *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 117-18 (1982)). "Moreover, '[t]he [attorney-client] privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.' " *Fischel & Kahn*, 189 Ill. 2d at 585 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

¶ 32    Illinois adheres "to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Waste Management*, 144 Ill. 2d at 190. The privilege is to be strictly confined within its narrowest limits and limited solely to those communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such. *Waste Management*, 144 Ill. 2d at 190.

¶ 33                                   B. *Subject-Matter Waiver*
¶ 34                                   1. Waiver in General
¶ 35    Among the exceptions to the attorney-client privilege is the concept of "waiver." The attorney-client privilege belongs to the client, rather than the attorney, although the attorney asserts the privilege on behalf of the client. *Decker*, 153 Ill. 2d at 313. Only the client may waive the privilege. *Decker*, 153 Ill. 2d at 313. The attorney, although presumed to have authority to waive the privilege on the client's behalf, may not do so over the client's objection. Richard O. Lempert et al., A Modern Approach to Evidence 884-85 (3d ed. 2000). "Any disclosure by the client is inherently inconsistent with the policy behind the privilege of facilitating a confidential attorney-client relationship and, therefore, must result in a waiver of the privilege." *Profit Management Development, Inc., v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill. App. 3d 289, 299 (1999). Thus, for example, the attorney-client privilege may be waived by the client when the client voluntarily testifies to the privileged matter (*Profit Management*, 309 Ill. App. 3d at 299), or when the client voluntarily injects into the case either a factual or legal issue, the truthful resolution of which requires

examination of confidential communications, such as legal malpractice actions (*Fischel & Kahn*, 189 Ill. 2d at 585; *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004)). The basic, well-settled rule is that when a client discloses to a third-party a privileged communication, that particular communication is no longer privileged and is discoverable or admissible in litigation. Michael H. Graham, Evidence: An Introductory Problem Approach 563 (2002) ("The holder of the privilege against disclosure of the confidential matter or communication waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication ***.").

¶ 36                                    2. The Subject Matter Waiver Doctrine

¶ 37      The type of waiver at issue in the present case is known as "subject matter waiver." According to Wigmore, "[t]he client's offer of his own or the attorney's testimony as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter." (Emphasis in original.) 8 John Henry Wigmore, Evidence § 2327, at 638 (McNaughton rev. ed. 1961). Further, a client's offer of his own or his "attorney's testimony as to a *part of any communication* to the attorney is a waiver as to the whole of that communication, on the analogy of the principle of completeness." (Emphasis in original.) 8 John Henry Wigmore, Evidence § 2327, at 638 (McNaughton rev. ed. 1961); *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) ("[A]ny voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.").

¶ 38      Illinois has long recognized the doctrine of subject matter waiver, with this court holding that when a client voluntarily testifies and waives the privilege, such waiver "extends no further than the *subject-matter concerning which testimony had been given by the client.*" (Emphasis added.) *People v. Gerold*, 265 Ill. 448, 481 (1914). Our appellate court has refined and elaborated on subject matter waiver:

> "Although voluntary disclosure of confidential information does not effectively waive an attorney-client privilege as to all other non-disclosed communications that may have taken place [citation], where a client reveals portions of her conversation with her attorney, those revelations amount to a waiver of the attorney-client privilege as to the remainder of the conversation or communication about the same subject matter." *In re Grand Jury January 246*, 272 Ill. App. 3d 991, 997 (1995) (citing *People v. O'Banner*, 215 Ill. App. 3d 778, 793 (1991)).

¶ 39      The purpose behind the doctrine of subject matter waiver is to prevent partial or selective disclosure of favorable material while sequestering the unfavorable. *Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*, No. 95 C 1303, 1995 WL 360590, *8 (N.D. Ill. June 14, 1995). "This is so because the privilege of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former." 8 John Henry Wigmore, Evidence § 2327, at 638 (McNaughton rev. ed. 1961). Courts have characterized

this reasoning as the "sword" and the "shield" approach, in that a litigant should not be able to disclose portions of privileged communications with his attorney to gain a tactical advantage in litigation (the sword), and then claim the privilege when the opposing party attempts to discover the undisclosed portion of the communication or communications relating to the same subject matter. *In re Echostar Communications Corp.*, 448 F.3d 1294, 1303 (Fed. Cir. 2006) ("The overarching goal of waiver in such a case is to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice."); *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.*), 348 F.3d 16, 24 (1st Cir. 2003) ("Implying a subject matter waiver in such a case ensures fairness because it disables litigants from using the attorney-client privilege as both a sword and a shield.").

¶ 40    The Supreme Court of Delaware articulated the importance of fairness to the subject matter waiver doctrine thusly:

> "The purpose underlying the rule of partial disclosure is one of fairness to discourage the use of the privilege as a litigation weapon in the interest of fairness. A party should not be permitted to assert the privilege to prevent an inquiry by an opposing party where the professional advice, itself, is tendered as a defense or explanation for disputed conduct. [Citation.] VLI introduced portions of the advice of its new patent counsel in support of its claim that the disclosures concerning the prospect of the patent reinstatement were adequate given the uncertainty surrounding that issue. It would be manifestly unfair to permit selective utilization of these portions and at the same time assert the attorney-client privilege to shield any inquiry into the totality of counsel's advice and its factual basis. [Citation.]" *Zirn v. VLI Corp.*, 621 A.2d 773, 781-82 (Del. 1993).

See also *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 457 (N.D. Ill. 1974) ("[W]hen a party's conduct reaches a certain point of disclosure fairness requires that the privilege should cease whether the party intended that result or not. A party cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.").

¶ 41                3. Application of the Subject Matter Waiver Doctrine
                          to Extrajudicial Settings

¶ 42    The issue for the court to decide in this case is whether the subject matter waiver doctrine extends to disclosures of privileged communications made in an extrajudicial setting. Defendants argue that the purpose of the doctrine would be defeated if the court applied it to disclosures made outside of litigation, since the purpose of the doctrine is prevent a party from using the privilege as a weapon to gain tactical advantage in litigation. Further, defendants claim extending subject matter waiver outside of litigation would hamper attorneys' ability to provide legal advice to clients during business transactions and other matters. Plaintiffs respond that some courts have found subject matter waiver extends to extrajudicial disclosures, and that such an extension would be in keeping with this state's policy of open disclosure and search for the truth.

¶ 43    First, both parties would concede that the vast majority of cases to apply the subject

matter waiver doctrine have done so in the context of judicial disclosures. This court could find no Illinois state case, and the parties could point to none, that applied the doctrine to a disclosure made in an extrajudicial[3] setting. Illinois cases have applied subject matter waiver in the context of litigation. In *Gerold*, the disclosures giving rise to subject matter waiver occurred during court testimony in a criminal case. *Gerold*, 265 Ill. at 481. In *Newton v. Meissner*, 76 Ill. App. 3d 479, 499 (1979), the plaintiff voluntarily testified on cross-examination at trial that she told her attorney (at the time) that she had no recollection of the accident, thus waiving the privilege and opening the door for her former attorney to testify concerning that particular matter. In *In re Grand Jury January 246*, the court found subject matter waiver where a witness testified in her deposition that her attorneys had discussed "financial options" with her in her lawsuit against a congressman. *In re Grand Jury January 246*, 272 Ill. App. 3d at 996-97. In *O'Banner*, subject matter waiver applied when the defendant took the stand and testified as to portions of conversations with his attorney. *O'Banner*, 215 Ill. App. 3d at 793. Thus, the issue of whether subject matter waiver extends to extrajudicial disclosures is one of first impression in Illinois.[4]

¶ 44    The extension of subject matter waiver to extrajudicial disclosures, however, has been addressed in the federal courts. Two federal appellate courts, in *In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987), and *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16 (1st Cir. 2003), have examined the issue and determined that subject matter waiver should not extend to extrajudicial disclosures.

¶ 45    In *In re Von Bulow*, the plaintiffs attempted to claim subject matter waiver based on extrajudicial disclosures made in a book written by Claus von Bulow and his attorney Alan Dershowitz about Von Bulow's prosecution for the murder of his wife. The plaintiffs had filed a civil suit against Von Bulow over his wife's murder. After the civil suit commenced, Von Bulow and Dershowitz published a book chronicling Von Bulow's first trial, successful appeal, and eventual acquittal at a second trial. The plaintiffs moved to compel discovery of certain discussions between Von Bulow and Dershowitz based on the alleged waiver of attorney-client privilege with respect to communications related in the book. The trial court found Von Bulow waived the privilege via the publishing of the book, and extended waiver

---

[3]For purposes of this opinion, the court relies on the Black's Law Dictionary definition of "extrajudicial." Extrajudicial is defined as "[o]utside court; outside the functioning of the court system <extrajudicial confessions>. — Also termed *out-of-court*." Black's Law Dictionary 665 (9th ed. 2009).

[4]In its brief, defendant Westfield cites to *In re Estate of Hoover*, 226 Ill. App. 3d 422 (1992), as support for not applying subject matter waiver to extrajudicial disclosures. In *Hoover*, the plaintiff, seeking testimony from the attorney for his ex-wife in a will contest, argued that the privilege had been "completely waived" by prior disclosures via the ex-wife's letters to third parties discussing communications with her attorneys. The trial court found waiver as to the disclosed information, but found no blanket waiver as to the undisclosed communications. Defendants argue that this is proof that Illinois courts disfavor subject matter waiver in extrajudicial disclosures, but plaintiffs correctly point out the *Hoover* court said nothing about "extrajudicial" disclosures in its opinion.

to: (1) the contents of the published conversations; (2) all communications between Von Bulow and Dershowitz relating to the published conversations; and (3) all communications between Von Bulow and any defense attorney relating to the published conversations. *Von Bulow*, 828 F.2d at 100.

¶ 46    On review, the reviewing court found Von Bulow had waived the privilege. However, the court refused to extend subject matter waiver when "the privilege-holder or his attorney [have] made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation." *Von Bulow*, 828 F.2d at 102. First, as to unpublished contents of the published conversations, the appellate court noted that the cases relied on by the trial court finding implied waivers on account of fairness involved material issues *raised by a client's assertion during the course of a judicial proceeding*. *Von Bulow*, 828 F.2d at 102. The court concluded that, under the fairness doctrine, extrajudicial disclosures of an attorney-client communication, not subsequently used by the client in a judicial proceeding to his adversary's prejudice, do not waive the privilege as to the undisclosed portions of the communication. *Von Bulow*, 828 F.2d at 102.

¶ 47    Next, concerning communications between Von Bulow and Dershowitz that had the same subject matter as those disclosed in the book, the court noted that subject matter waiver "has been invoked most often where the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or where the attacking party has been prejudiced at trial." *Von Bulow*, 828 F.2d at 103. The court held that subject matter waiver did not apply to extrajudicial disclosures, concluding:

> "[W]here, as here, disclosures of privileged information are made extrajudicially and without prejudice to the opposing party, there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed. Matters actually disclosed in public lose their privileged status because they obviously are no longer confidential. The cat is let out of the bag, so to speak. But related matters not so disclosed remain confidential. Although it is true that disclosures in the public arena may be 'one-sided' or 'misleading', so long as such disclosures are and remain extrajudicial, there is no *legal* prejudice that warrants a broad court-imposed subject matter waiver. The reason is that disclosures made in public rather than in court—even if selective—create no risk of *legal* prejudice until put at issue in the litigation by the privilege-holder. Therefore, insofar as the district court broadened petitioner's waiver to include related conversations on the same subject it was in error." (Emphases in original.) *Von Bulow*, 828 F.2d at 103.

¶ 48    A subsequent federal appellate court opinion, *In re Keeper of the Records*, reaffirmed the holding of *Von Bulow*. In *In re Keeper of the Records*, XYZ Corporation made a decision to recall a medical device. XYZ conducted a conference call with its co-venturer Smallco to discuss the recall. The participants in the discussion included two officers of XYZ, outside counsel for XYZ, the principals of Smallco, and Smallco's medical advisor. During the conference call, XYZ's outside counsel advocated for XYZ's position in the face of strong counterarguments from the Smallco representatives. The federal government soon commenced an investigation of XYZ and, as part of that investigation, filed a motion to compel the production of certain documents. The government argued that XYZ had waived

the attorney-client privilege during its conference call with Smallco because XYZ's outside counsel had given legal advice in the presence of third parties and had disclosed legal advice previously provided to XYZ, thus effecting a waiver of attorney-client privilege as to all communications on the same subject matter. The trial court agreed and granted the motion.

¶ 49     On appeal, the reviewing court agreed with the trial court that any previously privileged information actually revealed during the call lost any veneer of privilege. However, the court rejected any application of subject matter waiver to the extrajudicial conference call. The court noted that:

> "Virtually every reported instance of an implied waiver extending to an entire subject matter involves a judicial disclosure, that is, a disclosure made in the course of a judicial proceeding. See *von Bulow*, 828 F.2d at 103 (collecting cases). This uniformity is not mere happenstance; it exists because such a limitation makes eminently good sense. Accordingly, we hold, as a matter of first impression in this circuit, that the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter." *In re Keeper of the Records*, 348 F.3d at 24.

¶ 50     The court went on to explain the rationale behind its holding, noting "[t]here is a qualitative difference between offering testimony at trial or asserting an advice of counsel defense in litigation, on the one hand, and engaging in negotiations with business associates, on the other hand." *In re Keeper of the Records*, 348 F.3d at 24. The court found that in the litigation setting, the likelihood of prejudice loomed large so that once a litigant put privileged communications at issue, only the revelation of all related exchanges allowed the truth-seeking process to function unimpeded. *In re Keeper of the Records*, 348 F.3d at 24. In the business negotiation setting, however, concerns of prejudice are absent, as the introduction of a party's attorney into the proceedings does nothing to cause prejudice to the opposition or subvert the truth-seeking process. *In re Keeper of the Records*, 348 F.3d at 24.

¶ 51     In support of their argument that subject matter waiver should apply to extrajudicial disclosures, plaintiffs cite to *Flagstar Bank, FSB v. Freestar Bank, N.A.*, No. 09 C 1941, 2009 WL 2706965 (N.D. Ill. Aug. 25, 2009). In *Flagstar*, the plaintiff asserted the defendant waived the attorney-client privilege when the defendant disclosed a certain document to a third party, apparently outside the context of litigation or judicial proceedings. Specifically, the disclosure at issue concerned a letter authored by the defendant's attorney and forwarded to the defendant's president, who in turn sent the letter to an employee of a company the defendant hired for marketing services. *Flagstar*, 2009 WL 2706965, at *5. The court found the letter was not privileged, as it was disclosed to a third party who was not acting in a legal capacity for the defendant. The court found that disclosing the letter "effectuated a waiver of the attorney client privilege as to that document and to any other documents of the same subject matter." *Flagstar*, 2009 WL 2706965, at *6.

¶ 52     Plaintiffs further cite to *In re OM Group Securities Litigation*, 226 F.R.D. 579 (N.D. Ohio 2005), as an example of a court applying subject matter waiver to purely extrajudicial disclosures. In *OM Group*, a plaintiff shareholder sued defendant corporation in a

shareholder action. The defendant corporation's audit committee was conducting an investigation of defendant. The audit committee's counsel, and a forensic accounting firm hired by counsel, gave a power point presentation to the corporation's board of directors regarding the findings of the ongoing investigation. The plaintiff shareholder filed a motion to compel production of documents underlying the presentation. After being provided the power point presentation itself, along with two spreadsheets regarding the investigation, defendant refused to provide any of the requested underlying documents. The plaintiff argued that the defendants waived any privilege over the documents containing the same subject matter as the presentation. The defendants argued that the scope of any waiver should be narrowly construed because they would not gain an unfair tactical advantage by the power point presentation and the two spreadsheets.

¶ 53 The court ordered the production of the underlying documents, finding they were within the scope and subject matter of the audit committee's intentional disclosure. *OM Group*, 226 F.R.D. at 593. The court rejected the defendants' pledge that they would not use the underlying documents for a tactical advantage in the litigation, reasoning:

> "Defendants attempt to restrict application of the fairness doctrine solely to whether they would gain a tactical advantage in litigation by not disclosing the underlying documents. The Court does not interpret the fairness doctrine so narrowly. The Court must consider, not only whether there is a tactical benefit, but whether it is fair to uphold the privilege considering the nature of the disclosure." *OM Group*, 226 F.R.D. at 593.

¶ 54 Plaintiff also points to a comment from the Restatement (Third) of The Law Governing Lawyers, stating "[w]ith respect to out-of-court partial disclosures, the substantial majority of decisions announces a broad and almost automatic subject-matter-waiver rule." Restatement (Third) of The Law Governing Lawyers § 79, Reporters Notes cmt. f (2000). The comment cites to several federal court cases in support. In *In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989), a company that had contracted with the Department of Defense was being audited by the Defense Contract Audit Agency (DCAA). During the audit, an internal company document containing legal advice was disclosed to the DCAA. While acknowledging that "a waiver of the privilege in an attorney-client communication extends 'to all other communications relating to the same subject matter,' " the court remanded the cause to the lower court for a determination of how broadly to apply the waiver. *In re Sealed Case*, 877 F.2d at 980-81 (quoting *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982)).

¶ 55 In *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988), the court allowed in all privileged communications relating to a position paper sent by a company facing indictment to the United States Attorney. The position paper contained legal arguments on why the company should not be indicted. In *AMCA International Corp. v. Phipard*, 107 F.R.D. 39 (D. Mass. 1985), the plaintiff sent a memorandum to the defendant containing legal advice the plaintiff had received regarding a new formula for calculating royalties for the defendant (it is not clear from the written opinion if this was before or after initiation of litigation). The defendant argued that the disclosure of the memorandum operated as a waiver of the privilege not only as to the document but to all documents relating to the same subject matter. The court held the release of the memorandum served as a waiver of the privilege as

-16-

to a partial group of documents which related to the same subject matter, but would not extend the waiver to *all* prior and subsequent communications between plaintiff and its counsel on the interpretation of the contracts at issue. *AMCA*, 107 F.R.D. at 44.

¶ 56     Finally, in *Smith v. Alyeska Pipeline Service Co.*, 538 F. Supp. 977 (D. Del. 1982), the court ordered production of 36 documents exchanged between the plaintiff and his attorney relating to an infringement case. The court found that the plaintiff had waived the privilege when plaintiff's attorney, acting on behalf of plaintiff, sent an opinion letter to the defendant concerning the same subject matter as that contained in the 36 privileged documents. The disclosure was apparently made in an extrajudicial context.

¶ 57     We find the line of cases declining to extend subject matter waiver to extrajudicial disclosures more persuasive. First, limiting application of subject matter waiver to disclosures made in litigation better serves the purpose of the doctrine. The purpose of the doctrine is to prevent a party from strategically and selectively disclosing partial attorney-client communications with his attorney to use as a sword, and then invoking the privilege as a shield to other communications so as to gain a tactical advantage *in litigation*. See *In re Keeper of the Records*, 348 F.3d at 24. Expanding the doctrine to cover extrajudicial disclosures that are not made for tactical advantage in litigation would necessarily broaden the scope of the doctrine's purpose. When a partial disclosure is made in the litigation context, the apparent prejudice that could result to the opposing party is obvious: a party has injected into the litigation communications with his attorney which may aid in the party's prosecution or defense of a claim, yet the party can also frustrate the truth-seeking process by claiming privilege when the opposition seeks to discover the full context of the confidential communications. Such an abuse of the judicial process should be looked upon with disfavor, and the doctrine of subject matter waiver ensures that the full context of the partial disclosure is discoverable so the court may fulfill its truth-seeking function and extend fairness to the opposing party. That same purpose is not served, however, when the doctrine is expanded to cover disclosures made before litigation is initiated or, in many cases, even contemplated.

¶ 58     Next, the cases cited in support of limiting the doctrine to the context of litigation are more thorough and persuasive than those cited in opposition. As discussed above, both *In re Keeper of the Records* and *Von Bulow* contain detailed and thorough reasoning as to why the subject matter waiver doctrine should not be extended to purely extrajudicial disclosures. See *In re Keeper of the Records*, 348 F.3d at 24-26; *Von Bulow*, 828 F.2d at 101-03. In contrast, *Flagstar* and the cases cited in the Restatement (Third) of The Law Governing Lawyers do not contain any reasoning or explanation for why subject matter waiver should extend to purely extrajudicial disclosures. We acknowledge that in those cases the courts did apply subject matter waiver to what appear to be extrajudicial disclosures.[5] However, as

---

[5]In *AMCA* it is not exactly clear if the disclosures were made before or after the initiation of litigation. See *AMCA*, 107 F.R.D. at 40-41. In *In re Sealed Case* and *In re Martin Marietta Corp.*, the disclosures were made during the pendency of a government audit and a government investigation leading to a possible indictment by the United States Attorney, respectively. See *In re Sealed Case*, 877 F.2d at 977-78; *In re Martin Marietta Corp.*, 856 F.2d at 623. Under the Federal

those cases do not contain any reasoning or justification for extension of the subject matter waiver doctrine, we do not find them as persuasive as the more complete analyses found in *In re Keeper of the Records* and *Von Bulow*.

¶ 59    Further, we reject the analysis of the court in *OM Group*. The *OM Group* court explicitly declined to decide whether the defendants gained a tactical advantage in litigation through its extrajudicial partial disclosures, instead relying solely on fairness to apply subject matter waiver. *OM Group*, 226 F.R.D. at 593. The purpose behind subject matter waiver is to prevent the disclosing party from using the privilege as a sword and a shield in litigation, *i.e.*, to prevent one party from gaining a tactical advantage in litigation over another party through selective use of the privilege. "Fairness" should not be separated from the "tactical advantage" aspect of subject matter waiver's purpose. The *OM Group* analysis is incomplete.

¶ 60    Finally, we believe limiting subject matter waiver to the context of judicial disclosures to be sound policy. "[A] rule that would allow broad subject matter waivers to be implied from such communications would provide perverse incentives: parties would leave attorneys out of commercial negotiations for fear that their inclusion would later force wholesale disclosure of confidential information." *In re Keeper of the Records*, 348 F.3d at 24. We agree with the *In re Keeper of the Records* court that such a consequence would strike at the heart of the attorney-client relationship and could deprive clients of counsel at times when such counsel is most valuable.

¶ 61    While we do not limit our holding only to advice given in business transactions, we recognize that the present case involves a business transaction and business negotiations would be uniquely burdened by extending subject matter waiver. We find informative the analysis of the court in *Hewlett-Packard Co. v. Bausch & Lomb Inc.*:

> "This court also is concerned about the effect that finding waiver too freely might have on the sort of business transaction in which defendant and GEC were involved. Holding that this kind of disclosure constitutes a waiver could make it appreciably more difficult to negotiate sales of businesses and products that arguably involve interests protected by laws relating to intellectual property. Unless it serves some significant interest courts should not create procedural doctrine that restricts communication between buyers and sellers, erects barriers to business deals, and increases the risk that prospective buyers will not have access to important information that could play key roles in assessing the value of the business or product they are considering buying. Legal doctrine that impedes frank communication between buyers and sellers also sets the stage for more lawsuits, as buyers are more likely to be unpleasantly surprised by what they receive. By refusing to find waiver in these settings courts create an environment in which businesses can share more

---

Rules of Evidence, if a disclosure is made in a federal proceeding or *to a federal office or agency* and the disclosure waives the privilege, the waiver extends to an undisclosed communication in a federal or state proceeding if the waiver is intentional, the disclosed communication concerns the same subject matter, and the communications ought to, in fairness, be considered together. Fed. R. Evid. 502(a).

freely information that is relevant to their transactions. This policy lubricates business deals and encourages more openness in transactions of this nature." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 115 F.R.D. 308, 311 (N.D. Cal. 1987).

¶ 62 It is of no matter if disclosure made during a business negotiation is done to gain a tactical advantage during the *business negotiation*. Such a disclosure during a business negotiation is not in the province of this court, but is between the two entities engaging in the negotiation, unless a law or Illinois legal ethics rule was broken. Further, to address a point raised at oral argument, if a disclosure is made during a business negotiation to gain a later tactical advantage in anticipated litigation, subject matter waiver would still apply if such a disclosure is later used by the disclosing party at any point *during the litigation* to gain a tactical advantage. See *In re Keeper of the Records*, 348 F.3d at 25 ("[I]f confidential information is revealed in an extrajudicial context and later reused in a judicial setting, the circumstances of the initial disclosure will not immunize the client against a claim of waiver."). However, if the disclosure is not later reused during litigation, subject matter waiver would not apply, regardless of whether there was some hidden intent on the part of the disclosing party to gain some sort of advantage in later litigation. To apply subject matter waiver in such a manner would require determining the intent of the disclosing party, and would be pure speculation on the court's part as to why the disclosure was made. Further, if the disclosure is not later used in litigation, it would not serve the purpose of the subject matter waiver doctrine. We hold that subject matter waiver does not apply to the extrajudicial disclosure of attorney-client communications not thereafter used by the client to gain an adversarial advantage in litigation. See *In re Keeper of the Records*, 348 F.3d at 24.

¶ 63   II. *Whether Defendants' Statements During Discovery Depositions Placed Disclosures at Issue in Litigation*

¶ 64 Plaintiffs contend, in the alternative, that even if this court holds that subject matter waiver does not apply to extrajudicial disclosures, the doctrine would still apply in this case because defendants are using the legal advice they received to advance their defense in the underlying lawsuit. Specifically, plaintiffs argue that defendants' witnesses (Rouse's officers Deering and Minutoli and Westfield executive Stefanek[6]), during deposition testimony, disclosed privileged communications in order to gain a tactical advantage in the litigation. Defendants respond that plaintiffs' alternative argument is completely unsupported by the record.

¶ 65 While privileged extrajudicial disclosures are not subject to subject matter waiver, if those same privileged communications are later reused in a judicial setting, the circumstances of the initial disclosure will not immunize the client against a claim of waiver. See *In re*

---

[6]Plaintiffs also cited to the deposition testimony of a witness for Simon. However, as Simon waived the privilege and chose not to appeal the circuit court's order, we will not consider the testimony of Simon's witness. Only the client may waive the privilege. *Decker*, 153 Ill. 2d at 313. Therefore, in determining whether Westfield and Rouse waived the privilege, we will consider only the testimony of Westfield and Rouse's executives.

*Keeper of the Records*, 348 F.2d at 25. Thus, if defendants have introduced into the litigation privileged communications to be used as a sword for tactical advantage, those communications, and undisclosed communications of the same subject matter, are discoverable. Whether the attorney-client privilege or any exception thereto exists is reviewed *de novo*. *Norskog*, 197 Ill. 2d at 71; *Fox Moraine, LLC v. United City of Yorkville*, 2011 IL App (2d) 100017, ¶ 63.

¶ 66    In general, " '[w]aiver' means the voluntary relinquishment of a known right" and arises from an affirmative, consensual act consisting of an intentional relinquishment of a known right. *Maniez v. Citibank, F.S.B.*, 404 Ill. App. 3d 941, 947 (2010). A waiver by a client of the attorney-client privilege can be either express or implied. *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004). A clear example of an express waiver is when a client voluntarily testifies about privileged communications. See *Profit Management*, 309 Ill. App. 3d at 299. The client may also waive the privilege by expressly agreeing to do so or by failing to assert the privilege when privileged information is requested. Richard O. Lempert et al., A Modern Approach to Evidence 885 (3d ed. 2000). An implied waiver may be found when the client asserts claims or defenses that put his or her communications with the legal advisor at issue in the litigation. *Profit Management*, 353 Ill. App. 3d at 300. However, a party can preserve the privilege when it attempts to limit disclosure. See *In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1314 (7th Cir. 1984). Generally, failure to assert the privilege prior to turning over the privileged documents constitutes a voluntary waiver. See *Maryville Academy v. Loeb Rhoades & Co.*, 559 F. Supp. 7, 8-9 (N.D. Ill. 1982). The determination of whether a party has waived the privilege must be made on a case-by-case basis. *Ritacca v. Abbott Laboratories*, 203 F.R.D. 332, 335 (N.D. Ill. 2001).

¶ 67    If waiver is found, the next step is to determine the scope of the waiver and whether the waiver applies to all of the communications relating to the same subject matter. *Rowe International Corp. v. Ecast, Inc.*, 241 F.R.D. 296, 301 (N.D. Ill. 2007). " '[T]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures.' " *Rowe*, 241 F.R.D. at 301 (quoting *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349-50 (Fed. Cir. 2005)).

¶ 68    We will examine the deposition testimony of Deering, Minutoli, and Stefanek cited by plaintiffs in turn to determine first if waiver occurred and, if so, the scope of the waiver and the waiver's subject matter. We find that Deering and Minutoli, in their depositions, did not voluntarily waive the privilege as to legal advice received from counsel and shared with third parties. The cited deposition testimony of Deering and Minutoli concern the third-party disclosures made by defendants to each other during the 2001-02 business negotiations. First, we note that the testimony was elicited after repeated questioning by plaintiffs' attorney. Next, and most important, the testimony occurred after the circuit court granted plaintiffs' motion to compel and ordered the production of documents containing or discussing the shared communications. Defendants had contested that motion to compel and invoked the privilege. Following the court's order on the motion to compel, it is apparent that defendants were operating under the assumption that the court had deemed the privilege waived for documents and communications containing legal advice that were shared among defendants.

Thus, defendant Rouse did not voluntarily waive the privilege during the depositions. See *Regan v. Garfield Ridge Trust & Savings Bank*, 220 Ill. App. 3d 1078, 1090-91 (1991) (privilege not waived where former attorney called to testify by client and reveals no privileged communications during direct examination and, during cross examination attorney properly invokes the privilege during questioning); *Profit Management*, 309 Ill. App. 3d at 300 ("The plaintiffs further waived the privilege when they did not object to the material in federal court on the basis of its confidential nature.").

¶ 69   Plaintiffs also contend that Stefanek, Westfield's chief financial officer, waived the privilege as to attorney-client communications discussed openly among defendants. Again, for the same reasons discussed above, we do not find Stefanek's testimony to have waived the privilege. Attorney-client communications shared among defendants had already been deemed waived by the circuit court in its December 10, 2008, order. Defendants had objected to the motion to compel, invoking the privilege. When Stefanek was deposed on January 7, 2009, a month after the order, the transcript reveals Stefanek, Westfield's attorney *and* plaintiffs' attorney were operating under the assumption that any privilege as to the shared communications had been deemed waived, pursuant to the order of the circuit court. This is particularly illustrated in the following exchange after plaintiffs' counsel asked whether Stefanek's understanding of the synthetic partnership was based on legal advice received from counsel:

> "[Stefanek]: Well, we all signed it, so it would seem pretty logical that—you know, that—that anything significant would have been discussed with everybody, yes.
>
> [Plaintiffs' attorney]: Again, I think that's—*there's been a waiver in light of the court's prior ruling on that*, [Westfield's attorney], and did you want to reconsider your advice to instruct him not to answer that?
>
> [Westfield's attorney]: What's your question?
>
> [Plaintiffs' attorney]: I would like to know what the legal advice was.
>
> [Westfield's attorney]: If—if—as the—what—if—do you mind asking the foundational question, whether he knows what the legal advice that was shared was?
>
> [Plaintiffs' attorney]: You received legal advice on why Simon, Rouse and Westfield believed they could exclude certain provisions of the Urban partnership agreement. Correct?
>
> [Stefanek]: I received advice what—based on why we could." (Emphasis added.)

¶ 70   Clearly, the parties assumed that waiver had occurred, based on the court's ruling regarding the extrajudicial third-party disclosures made by defendants to each other during the 2001-02 business negotiations. By sharing information with each other, defendants, during the 2001-02 negotiations, had waived the attorney-client privilege with respect to documents and communications containing legal advice disclosed to third parties. However, for the reasons stated above in discussing Deering's and Minutoli's testimony, Stefanek did not waive the privilege during the deposition as to the shared communications.

¶ 71   Plaintiffs further argue that Stefanek waived the privilege as to certain advice he received

from Westfield's attorneys about the structure of the partnership, outside of the shared communications covered by the circuit court's December 10, 2008, order. During the deposition, plaintiffs' attorney asked Stefanek what the basis was "for [Stefanek's] awareness that there was no duty to consider new business opportunities for Urban." Westfield's attorney immediately objected, stating "[s]ame objection; same instruction." Stefanek then answered that the basis was legal advice given by Westfield attorney Peter Schwartz sometime during the acquisition of Rodamco. Plaintiffs' attorney then asked Stefanek the basis for Schwartz's legal advice. Westfield's attorney again objected and instructed Stefanek not to answer the question. The following exchange then occurred:

"[Plaintiffs' attorney]: Well, he's already testified to the legal advice. I take it you are waiving, right, privilege?

[Westfield's attorney]: No, we are not waiving.

[Plaintiffs' attorney]: Well, you let him testify to the legal advice.

[Westfield's attorney]: I have—you—I have given my instruction. You can proceed.

[Plaintiffs' attorney]: I just want you to know that we are going to move to compel because you can't have it both ways. You can't have him testifying to legal advice and then say that you are not waiving. So this will be a motion—

[Westfield's attorney]: He's—

[Plaintiffs' attorney]: —to compel. I just want to meet and confer on that now. So—

[Westfield's attorney]: Proceed with your questioning.

[Plaintiffs' attorney]: Okay. That's fine. So you are going to continue to stand on that instruction?

[Westfield's attorney]: Yeah. I am instructing him not to—not to reveal attorney-client advice.

[Plaintiffs' attorney]: All right."

¶ 72        Plaintiffs' attorney asked again about the basis for the legal advice. Westfield's attorney interjected, instructing Stefanek not to provide the *content* of the communication. When plaintiffs' counsel asked what the rationale for the legal advice was, Westfield's attorney stated, "I object it is—Instruct not to answer."

¶ 73        Based on the transcript excerpt provided in the record, we do not find that defendant Westfield waived the privilege through Stefanek's testimony. The record reveals that, while Stefanek did testify to legal advice received from Westfield's attorneys about the synthetic partnership, he did not testify as to the actual content and basis of the legal advice. See *United States v. O'Malley*, 786 F.2d 786, 794 (7th Cir. 1986) (a client does not waive the attorney-client privilege merely by disclosing a subject which he had discussed with his attorney, but rather, in order to waive the privilege the client must disclose the communication with the attorney itself). Further, and most importantly, the record shows that Westfield's attorney at the deposition repeatedly objected to plaintiffs' attorney's line of questioning regarding legal advice. Westfield's attorney indicated that he was standing on

-22-

his instruction to Stefanek "not to reveal attorney-client advice." Under such circumstances and facts, it is apparent that defendant Westfield invoked the privilege during the deposition, and thus did not waive it with regard to Stefanek's testimony.[7]

¶ 74    Plaintiffs finally argue that defendants have necessarily put the legal advice received from counsel "at issue," and thus effected an implied waiver by using legal advice as a defense in support of defendants' claims of "good faith" in constructing the synthetic partnership. See *Lama*, 353 Ill. App. 3d at 305. Plaintiffs claim they would suffer prejudice if defendants' witnesses are permitted to testify about their reliance on legal advice, but plaintiffs are precluded from obtaining discovery on the subject matter at issue. However, based on the record before this court, we see no evidence that defendants have claimed reliance, or are planning to claim reliance, on legal advice in its defense of this case. Outside of the deposition testimony, plaintiffs' have not pointed this court to any legal filings by defendants where defendants utilize legal advice as a defense. If any party has injected defendants' lawyers' legal advice into this case, it is plaintiffs. Plaintiffs have filed three motions to compel seeking privileged documents and communications. During depositions, it was plaintiffs' attorney who asked defendants' witnesses questions relating to legal advice the witnesses received. Plaintiffs have already received, following the granting of their motion to compel, documents where defendants waived the privilege by disclosing privileged communications with one another. We cannot say that defendants impliedly waived the privilege by putting "at issue" their attorney-client communications. If, on remand, defendants do inject their attorney-client communications into the litigation, the circuit court may revisit the issue. Upon the record provided to this court in this appeal, however, we do not find any waiver by defendants during the litigation.

¶ 75                                    CONCLUSION

¶ 76    In conclusion, we hold that subject matter waiver does not apply to disclosures made in an extrajudicial context when those disclosures are not thereafter used by the client to gain a tactical advantage in litigation. Further, the cited deposition testimony of defendants' corporate officers did not waive the attorney-client privilege so as to allow application of subject matter waiver to certain attorney-client communications. For the foregoing reasons, the appellate and circuit courts' judgments are reversed. The cause is remanded to the circuit court for proceedings consistent with this order.

¶ 77    Judgments reversed.

¶ 78    Cause remanded.

---

[7]It should be noted that Stefanek's testimony formed the basis of plaintiffs' second motion to compel. Plaintiffs argued that Stefanek "voluntarily injected" the legal advice into the case to suit a defensive position of defendant Westfield and was then refusing to answer questions related to the rationale of the legal advice. The circuit court denied plaintiffs' motion.