[Cite as *Jacobs v. Equity Trust Co.*, 2020-Ohio-6882.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

WILLIE JACOBS, et al.

    Appellees

    v.

EQUITY TRUST COMPANY, et al.

    Appellants

C.A. No.    20CA011621

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    13CV182283

DECISION AND JOURNAL ENTRY

Dated: December 28, 2020

CALLAHAN, Presiding Judge.

{¶1}    Appellants, Equity Trust Company, Equity Administrative Services, Inc., Jeffrey Desich, and Richard Desich, Sr., appeal an interlocutory order of the Lorain County Court of Common Pleas ordering the production of certain documents to appellees, Willie Jacobs, Elias Zachos, and Gerald Watts. For the reasons set forth below, this Court reverses.

I.

{¶2}    Willie Jacobs, Elias Zachos, and Gerald Watts (collectively "the Plaintiffs") filed a putative class action lawsuit against Equity Trust Company, Equity Administrative Services, Inc., Jeffrey Desich, and Richard Desich, Sr. (collectively "the Equity Defendants") alleging claims related to investment losses in their self-directed individual retirement accounts. One of the allegations asserted by the Plaintiffs involves Equity Trust Company ("Equity Trust") failing to disclose and charging fees on customers' uninvested cash in their accounts in contravention of the

Custodial Account Agreement ("the Agreement"). Equity Trust modified the Agreement in July 2011, and the Plaintiffs sought discovery regarding the revision of the Agreement.

{¶3} After having received 6,600 documents, the Plaintiffs filed a motion for an in camera inspection of approximately 1,260 documents that the Equity Defendants withheld on various grounds of privilege. After a status conference and further independent discussions between counsel, the number of disputed documents was eventually reduced to 225 documents.

{¶4} Relative to this appeal, the Equity Defendants submitted 50 of the 225 disputed documents for an in camera inspection. These 50 documents were organized in a binder under 40 tabbed sections and consisted of redacted emails and attached drafts of the Agreement that were exchanged internally between employees of Equity Trust and with legal counsel during June and July 2011 related to the revision of the Agreement. Along with the binder, the Equity Defendants filed two affidavits by Michael Dea, the CEO of Equity Trust, and their billing statements from Ulmer & Berne, LLP ("Ulmer & Berne"), as evidentiary support that the 50 documents were protected by attorney-client privilege. Following an in camera review, the trial court ordered the Equity Defendants to produce the documents contained within 31 of the 40 tabs.

{¶5} The Equity Defendants timely appeal, asserting one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED BY COMPELLING DEFENDANT-APPELLANT EQUITY TRUST COMPANY * * * TO PRODUCE DOCUMENTS PROTECTED FROM DISCLOSURE BY THE ATTORNEY-CLIENT PRIVILEGE.

{¶6} The Equity Defendants assert that the trial court erred when it ordered them to produce documents to the Plaintiffs that are protected by attorney-client privilege. We agree.

{¶7} Generally, this Court applies an abuse of discretion standard when reviewing discovery orders. *Teodecki v. Litchfield Twp.*, 9th Dist. Medina No. 14CA0035-M, 2015-Ohio-2309, ¶ 45, quoting *Giusti v. Akron Gen. Med. Ctr.*, 178 Ohio App.3d 53, 2008-Ohio-4333, ¶ 12 (9th Dist.). However, when the information sought in discovery is alleged to be confidential and privileged, it is a question of law that is reviewed de novo. *Teodecki* at ¶ 45, citing *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, ¶ 13. Because the discovery issue raised by the Equity Defendants involves whether the redacted emails and draft revisions of the Agreement are protected by the attorney-client privilege, we review this matter de novo. *See Teodecki* at ¶ 45. "A de novo review requires an independent review of the trial court's decision without any deference to the trial court's determination." *State v. Consilio,* 9th Dist. Summit No. 22761, 2006-Ohio-649, ¶ 4.

{¶8} "The attorney-client privilege exempts from the discovery process certain communications between attorneys and their clients. The privilege has long been recognized by the courts[.]" *Boone v. Vanliner Ins. Co.*, 91 Ohio St.3d 209, 210 (2001), fn. 2, citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) and *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 660 (1994). *See State ex rel. Leslie v. Ohio Housing Fin. Agency,* 105 Ohio St.3d 261, 2005-Ohio-1508, ¶ 19, quoting *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998) ("'The attorney-client privilege is one of the oldest recognized privileges for confidential communications.'"). The protection afforded by the attorney-client privilege extends to "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.* at 390.

{¶9} The primary purpose of this privilege is to "'encourage full and frank communications between attorneys and their clients and thereby promote broader public interests

in the observance of law and administration of justice.'" *State ex rel. Leslie* at ¶ 20, quoting *Upjohn Co.* at 389. The privilege "'applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice.'" *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, 294 (6th Cir.2002), quoting *In re Antitrust Grand Jury,* 805 F.2d 155, 162 (6th Cir.1986).

{¶10} "In Ohio, the attorney-client privilege is governed both by statute, R.C. 2317.02(A), which provides a testimonial privilege, and by common law, which broadly protects against any dissemination of information obtained in the confidential attorney-client relationship." *State ex rel. Dawson v. Bloom-Carroll Local School Dist.*, 131 Ohio St.3d 10, 2011-Ohio-6009, ¶ 27, citing *State ex rel. Toledo Blade Co. v. Toledo-Lucas Cty. Port Auth.,* 121 Ohio St.3d 537, 2009-Ohio-1767, ¶ 24. This matter is governed by common law attorney-client privilege because the discovery in dispute concerns the production of redacted emails and draft revisions of the Agreement, and not the testimony of an attorney. *See Grace v. Mastruserio*, 182 Ohio App.3d 243, 2007-Ohio-3942, ¶ 17 (1st Dist.). *See, e.g., Nageotte v. Boston Mills Brandywine Ski Resort*, 9th Dist. Summit No. 26563, 2012-Ohio-6102, ¶ 7-8.

{¶11} The Supreme Court of Ohio has repeatedly identified the factors that trigger the attorney-client privilege:

> "'(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.'"

*State ex rel. Lanham v. DeWine*, 135 Ohio St.3d 191, 2013-Ohio-199, ¶ 27, quoting *State ex rel. Leslie* at ¶ 21, quoting *Reed v. Baxter*, 134 F.3d 351, 355-356 (6th Cir.1998). The party seeking protection under the attorney-client privilege carries the burden of establishing the existence of the

privilege. *Peyko v. Frederick*, 25 Ohio St.3d 164, 166 (1986), quoting *Waldmann v. Waldmann*, 48 Ohio St.2d 176, 178 (1976).

{¶12} It is widely recognized that the attorney-client privilege applies to communications between corporations and their attorneys. *State ex rel. Leslie* at ¶ 22, citing *Upjohn Co.*, 449 U.S. at 390 and *Am. Motors Corp. v. Huffstutler*, 61 Ohio St.3d 343 (1991). *Accord Bennett v. Roadway Express, Inc.*, 9th Dist. Summit No. 20317, 2001 WL 866261, *14 (Aug. 1, 2001), citing *Upjohn Co.* at 390. The privilege extends not only to top executives, officers and agents of the corporation, but also to middle-level and lower-level employees of the corporation. *See Upjohn Co.* at 391. In order to fall within the attorney-client privilege, the communications between the attorney and the corporate employees must concern matters within the scope of the employees' corporate duties and the employees need to be aware that the communications were for the purpose of obtaining legal advice. *See id.* at 394. "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Id.* at 395, quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962).

{¶13} The attorney-client privilege rules set forth in *Upjohn* have been expanded to include "communications between non-attorney corporate employees where the communications were made for purposes of securing legal advice from counsel" and "relay[ing] legal advice." *Graff v. Haverhill N. Coke Co.*, S.D.Ohio No. 1:09-cv-670, 2012 WL 5495514, *7 (Nov. 13, 2012) and *McCall v. Procter & Gamble Co.*, S.D.Ohio No. 1:17-cv-406, 2019 WL 3997375, *4 (Aug. 22, 2019). *See Reckley v. Springfield*, S.D.Ohio No. 3:05-cv-249, 2008 WL 5234356, *2 (Dec. 12, 2008) ("The fact that communication about legal advice is between or among employees of the client does not deprive it of its privileged status."). In order for the attorney-client privilege to apply, there must be substantial proof that the dominant intent of the communications, which

includes documents, between non-attorney employees was to obtain legal advice. *In re Behr Dayton Thermal Prods., LLC*, 298 F.RD. 369, 375 (S.D.Ohio 2013), quoting *Comtide Holdings, LLC v. Booth Creek Mgt. Corp.*, S.D.Ohio No. 2:07-cv-1190, 2010 WL 5014483, *2-3 (Dec. 3, 2010). *See Waters v. Drake*, S.D.Ohio No. 2:14-cv-1704, 2015 WL 8281858, *3-4 (Dec. 8, 2015) (the attorney-client privilege applied to documents exchanged between non-attorney employees where the dominant purpose was to seek legal advice). Similarly, draft documents are protected by the attorney-client privilege when they are prepared for the purpose of obtaining or rendering legal advice. *See, e.g., Wilkinson v. Greater Dayton Regional Transit Auth.*, S.D.Ohio No. 3:11cv00247, 2014 WL 953546, *3 (Mar. 11, 2014) ("draft documents * * * prepared or analyzed" by counsel related to obtaining and giving legal advice were protected by attorney-client privilege); *Graff* at *22-24 (draft letters prepared by corporate employees at counsel's request and revised by counsel in furtherance of legal advice were protected by the attorney-client privilege). When the dominant purpose of the communication is a business decision and not legal advice, then "the communication cannot be insulated from discovery just by sending a copy of it to a lawyer." *Waters* at *4. *See McCall* at *5 ("A communication does not obtain privileged status simply because an attorney is copied.").

{¶14} When providing legal advice in the corporate context, legal and business considerations may be inextricably intertwined. *In re OM Group Securities Litigation*, 226 F.R.D. 579, 587 (N.D.Ohio 2005), citing *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 685 (W.D.Mich.1996). "[T]he fact that business considerations are weighed in the rendering of legal advice will not vitiate the attorney-client privilege." *In re OM Group Securities Litigation* at 587, citing *Picard Chem. Inc. Profit Sharing Plan* at 685-686. "'Where business and legal advice are intertwined, the legal advice must predominate for the communication to be

protected.'" *Alomari v. Ohio Dept. of Pub. Safety*, S.D.Ohio No. 2:11-cv-00613, 2013 WL 5180811, *2 (Sept. 13, 2013), quoting *Neuder v. Battelle Pacific Northwest Natl. Laboratory*, 194 F.R.D. 289, 292 (D.D.C.2000). When both legal and business advice are present in a communication, it is incumbent upon the court to "consider 'whether the predominant purpose of the communication is to render or solicit legal advice.'" *McCall* at *6, quoting *Cooey v. Strickland*, 269 F.R.D. 643, 650 (S.D.Ohio 2010). If the predominant purpose is legal advice, then all parts of the communication, including the non-legal portions, are protected by the attorney-client privilege. *Cooey* at 650.

{¶15} In this matter, the Equity Defendants have asserted the attorney-client privilege to 1) redacted emails and the attached draft revisions of the Agreement exchanged between employees of Equity Trust, 2) draft revisions of the Agreement that were attached to emails between outside counsel and Equity Trust employees, and 3) draft revisions of the Agreement that were attached to emails between Equity Trust employees. The Plaintiffs argue that the Equity Defendants have failed to show that the employees of Equity Trust were aware that the dominant purpose of the communications was legal advice. Also, the Plaintiffs argue that the drafts created by Equity Trust were sent to counsel solely to avoid disclosure. Lastly, the Plaintiffs argue that the attorney-client privilege does not apply to the redacted emails and the draft revisions of the Agreement because they do not reflect legal advice, but rather business decisions.

**Redacted emails and the attached draft revisions of the Agreement exchanged between officers and executive employees of Equity Trust (Tabs 9, 10, 12, 13, 15, 17, 18, 19, 20, 24, 25, and 26)**

{¶16} There are twelve tabs consisting of redacted emails with draft revisions of the Agreement attached to only ten of those emails. The other two emails contain portions of the draft revisions pasted into the email. These emails involve the following employees of Equity Trust:

Michael Dea, the President and Chief Financial Officer of Equity Trust; Jeffrey Bartlett, the Chief Compliance Officer of Equity Trust; Jeffrey Desich, the Chief Executive Officer of Equity Trust; and Richard Desich, the Chairman of the Board of Equity Trust.

{¶17} Mr. Dea averred in his affidavit that one of his job responsibilities was general oversight and management of Equity Trust's compliance and corporate governance, which included managing the drafting, amending, and review of documents and forms used by Equity Trust. In 2011, Equity Trust retained the law firm of Ulmer & Berne to provide legal advice regarding the revision of the Agreement, including the drafting and reviewing of proposed revisions. Attorneys Fein and Kahn rendered legal advice to Equity Trust on these legal issues.

{¶18} The Ulmer & Berne time entries reflect that Attorney Fein had conferences with Mr. Dea and Mr. Bartlett regarding revisions to the language in the Agreement starting in March 2011, resuming in May 2011, and continuing through July 2011. Additionally, Mr. Dea's affidavit states that he spoke with Attorney Fein on multiple occasions regarding revisions to the Agreement, that he and Mr. Bartlett worked directly with Attorney Fein discussing, preparing, and reviewing revisions to the Agreement, and he directed Mr. Bartlett to prepare the revisions of the Agreement in accordance with the legal advice from Ulmer & Berne and to forward the same to Ulmer & Berne in order to obtain legal advice. There are multiple emails from Mr. Bartlett to Attorneys Fein and Kahn forwarding various draft revisions of the Agreement for counsel's review.

{¶19} As for Messrs. Desich, there is an email, deemed privileged by the trial court (Tab 6), to them from Mr. Dea forwarding a draft revision of the Agreement and indicating that the draft revisions and comments in the Agreement are from Attorney Fein. Additionally, there is an email, deemed privileged by the trial court (Tab 22), from Mr. Bartlett to Messrs. Desich and Dea and

copied to Attorney Fein which attached another version of the draft revisions of the Agreement and indicated that Attorney Fein vetted the proposed language. Further, the amended privilege log reflects there was an email, not contested by the Plaintiffs (ETC 060271), from Attorney Fein to Messrs. Desich and Dea with the subject line "Revised IRA Agreements/Disclosure Statements." Lastly, the Ulmer & Berne billing records reflect Attorney Fein had conferences with Messrs. Desich regarding the draft revisions to the Agreement.

{¶20} Based upon the Ulmer & Berne billing records, Mr. Dea's affidavit, other emails deemed privileged by the trial court, and the amended privilege log, there is substantial proof that these officers and executives of Equity Trust were aware that their discussions in the redacted emails and the various draft revisions attached to the redacted emails were for the dominant purpose of relaying and obtaining legal advice.

{¶21} It is the Plaintiffs' position that the drafts in this case were non-privileged communications created by Equity Trust and funneled to Ulmer & Berne in an attempt to improperly invoke the attorney-client privilege. The Plaintiffs' characterization of the drafts and what transpired is not supported by the record.

{¶22} Mr. Dea's affidavit confirms that the Agreement was an existing document and Equity Trust retained Ulmer & Berne to obtain legal advice to amend the Agreement. Thus, the drafts in this matter are actually draft revisions to the existing Agreement, and not drafts of a new agreement. The billing records from Ulmer & Berne confirm that prior to Equity Trust having made the initial draft revisions, Attorney Fein reviewed the Agreement for the purpose of making revisions and Attorney Fein consulted with Messrs. Dea and Bartlett regarding revisions to the Agreement concerning disclosure requirements. Accordingly, the initial draft revisions prepared by Equity Trust and sent to Attorney Fein were the result of legal advice from Attorney Fein and

were forwarded to Attorney Fein for his review and further legal advice. The same holds true for the other draft revisions prepared by Equity Trust and sent to counsel. Again, the billing records show that Attorney Fein reviewed and analyzed the draft revisions and made further revisions to the language in the Agreement. Also, Mr. Dea's affidavit and the emails indicate that the draft revisions were sent to corporate officers and employees to relay and obtain legal advice.

{¶23} Accordingly, the emails, Mr. Dea's affidavit, and the billing records reflect that the draft revisions of the Agreement were not routine documents created by Equity Trust and exchanged between the corporate employees and then sent to Ulmer & Berne to avoid disclosure under the guise of attorney-client privilege, but rather were documents prepared based upon legal advice rendered and sent to counsel to obtain further legal advice. *Compare U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati*, S.D.Ohio No. 1:03-cv-167, 2009 WL 5033940, *2 (Dec. 11, 2009), quoting *Southeastern Pennsylvania Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 259 (E.D.Pa.2008) (routine non-privileged communications between non-attorney corporate officers or employees did not become privileged because an attorney was copied on the document or counsel was subsequently contacted). *See Graff*, 2012 WL 5495514, at *23 (attorney-client privilege applied to draft letters created by corporate employees, revised by counsel, and transmitted to and from counsel to further counsel's legal advice).

{¶24} The Plaintiffs also argue that the redacted emails and draft revisions reflect Equity Trust's business decisions for amending the Agreement and are not protected by attorney-client privilege. Without disclosing the content of the redacted emails in Tabs 9, 10, 12, 15, 18, 24, 25, and 26, these emails discussing proposed language changes did not encompass any business decisions or include any business advice. Nor did the attached draft revisions of the Agreement contain any discussions of business decisions. Moreover, the Ulmer & Berne billing records only

contain references to legal advice regarding disclosure requirements. Mr. Dea's affidavit avers that these discussions in the redacted emails concerned the substance of the proposed revisions which were based upon the legal advice of Ulmer & Berne and the proposed revisions to the Agreement were for the purpose of seeking further legal advice. Simply put, these redacted emails and the draft revisions were relaying and seeking legal advice from counsel.

{¶25} The Ulmer & Berne billing records and other emails in the binder support Mr. Dea's averments. Prior to and during the time in which the redacted emails with the attached draft revisions were exchanged between the officers and executives of Equity Trust, Mr. Bartlett forwarded to Attorney Fein the proposed language changes to the Agreement. For instance, Tab 15 is a redacted email attaching version 8 of the draft revisions of the Agreement and sent by Mr. Bartlett to Mr. Dea and copied to Messrs. Desich. Tab 16, ordered not to be produced by the trial court, contains an email sent one minute later from Mr. Bartlett to Attorney Fein attaching the same version 8 of the draft revisions. The billing records also show that during this same time period Attorney Fein received, reviewed, and analyzed the draft revisions; conferenced multiple times with Messrs. Bartlett, Dea, and Desich about the language in the Agreement and revisions of the same; and prepared additional revisions to the Agreement.

{¶26} Contrary to the Plaintiffs' suggestion, none of the redacted emails nor the attached draft revisions contain any reference to the business decisions behind the changes to the Agreement. Rather, the redacted emails and the attached draft revisions of the Agreement reflect that the dominant purpose of these documents exchanged between these officers and executives of Equity Trust was to relay and seek legal advice. Accordingly, the redacted emails in Tabs 25 and 26, in addition to the redacted emails and the attached drafts revisions in Tabs 9, 10, 12, 15, 18, and 24, are protected by the attorney-client privilege.

{¶27} Tabs 13, 17, and 19 are blank emails in which Jeffery Desich forwarded the redacted emails and attached draft revisions in Tabs 12, 15, and 18 from his work email account to his personal email account. Similarly, Tab 20 is also a blank email in which Richard Desich forwarded the redacted email and attached draft revisions in Tab 18 from his work email account to his personal email account. The forwarded emails and attachments in Tabs 13, 17, 19, and 20 are simply copies of the original emails and attachments in Tabs 12, 15, and 18. As we have concluded that Tabs 12, 15, and 18 are protected by the attorney-client privilege, so too are Tabs 13, 17, 19, and 20.

**Other draft revisions of the Agreement exchanged between**
**officers and executive employees of Equity Trust**
**(Tabs 1, 2, 4, 11, 14, 21, 27, and 29)**

{¶28} The draft revisions of the Agreement contained in Tabs 1, 2, 4, 11, 14, 21, and 27 were all exchanged between Messrs. Desich, Dea, and Bartlett. As discussed above, Messrs. Desich, Dea, and Bartlett were aware that the revisions to the Agreement were being done in response to Attorney Fein's legal advice and for the purpose of obtaining further legal advice. For the same reasons discussed in the previous section, these draft revisions of the Agreement do not reflect a business decision, but rather the dominant purpose of relaying and seeking legal advice. Accordingly, the draft revisions of the Agreement contained in Tabs 1, 2, 4, 11, 14, 21, and 27 are also protected under the attorney-client privilege. Additionally, Tab 29 is protected by the attorney-client privilege because it is a blank email whereby Richard Desich forwarded to himself, at another email address, an earlier email with draft revisions sent to him on July 10, 2011 from Mr. Bartlett regarding changes to the Agreement.

**Draft revisions of the Agreement and a webpage exchanged between**
**Mr. Bartlett and Ulmer & Berne**
**(Tabs 28, 35, 38, and 39)**

{¶29} The draft revisions of the Agreement contained in Tabs 28, 35, and 38 were exchanged between Mr. Bartlett and Attorneys Fein and Kahn. As discussed above, there is substantial evidence that Mr. Bartlett was aware that his communications with the attorneys at Ulmer & Berne were for the dominant purpose of obtaining legal advice and these communications do not reflect business decisions.

{¶30} The trial court determined that some of the final draft revisions of the Agreement (Tabs 32 and 36) sent by Mr. Bartlett to counsel were privileged, but other final draft revisions of the Agreement (Tabs 28, 35, and 38) sent by Mr. Bartlett to counsel during the same timeframe were not. This Court cannot discern the trial court's rationale for treating the final draft revisions of the Agreement differently.

{¶31} The final draft revisions in Tabs 28, 35, and 38 were sent to counsel for their final review and approval of the changes to the Agreement. The billing records reflect that counsel reviewed the final draft revisions of the Agreement and the reformatted version of the final draft revisions of the Agreement, engaged in research, further revised the language in the Agreement to reflect law changes, worked on incorporating and finalizing revisions to the Agreement, and had multiple conferences with Messrs. Bartlett and Dea regarding further changes to the Agreement. These final draft revisions were reviewed, analyzed, and revised by counsel and were integral to the give-and-take communications wherein legal advice was sought and given. *See Wilkinson*, 2014 WL 953546, at *3. Thus, these final draft revisions of the Agreement in Tabs 28, 35, and 38 were submitted to counsel for the dominant purpose of obtaining legal advice and are protected by the attorney-client privilege.

{¶32}  Tab 39 is a printout of a page from Equity Trust's website.  This webpage was modified in conjunction with the changes in the Agreement.  Mr. Bartlett sent the revised webpage to Attorney Fein asking him to review it and to advise if there was any "concern" with the revisions.  There is no indication that the webpage changes involved any business considerations.  Accordingly, the webpage was sent to counsel for the dominant purpose of seeking legal advice and Tab 39 is protected by the attorney-client privilege.

### Draft revisions of the Agreement exchanged between Messrs. Bartlett and Dea and Ms. Wampleman (Tabs 7 and 8)

{¶33}  The draft revisions of the Agreement contained in Tab 7 were emailed from Mr. Bartlett to Mr. Dea and copied to Kim Wampleman, while the draft revisions contained in Tab 8 were emailed from Ms. Wampleman to Mr. Dea and copied to Mr. Bartlett.  As discussed above, there is substantial evidence that Messrs. Bartlett and Dea were aware that the draft revisions of the Agreement were for the dominant purpose of obtaining legal advice.  The same is true for Ms. Wampleman, an Internal Auditor at Equity Trust.

{¶34}  Mr. Dea avers that Ms. Wampleman was involved with the revision project.  This is supported by the emails in these Tabs.  In Tab 7, Mr. Bartlett's email to Mr. Dea attaching revision 4 of the Agreement states that "Kim and I have revised this per our discussion earlier today."  Tab 8 shows that the next day, Ms. Wampleman emailed Mr. Dea version 5 of the draft revisions with the message, "Newest revisions are underlined and highlighted."  Further, Ms. Wampleman was copied on the redacted email in Tab 10 in which Mr. Bartlett discussed the substance of Ulmer & Berne's legal advice and attached version 6 of the draft revisions to Mr. Dea.  Additionally, the billing records from Ulmer & Berne contain an entry that Attorney Fein had a conference with Messrs. Dea and Bartlett and Ms. Wampleman regarding the revisions of

the Agreement. Based upon Mr. Dea's affidavit, the emails, and the Ulmer & Berne billing records, there is substantial proof that Ms. Wampleman was aware that the draft revisions to the Agreement were for the dominant purpose of relaying and obtaining legal advice.

{¶35} As with the other draft revisions of the Agreement, these draft revisions do not reflect business decisions. Rather, these draft revisions were part of the ongoing revision process and reflect that the dominant purpose of these documents exchanged between Messrs. Dea and Bartlett and Ms. Wampleman was to relay and seek legal advice. For these reasons, the draft revisions of the Agreement contained in Tabs 7 and 8 are also protected under the attorney-client privilege.

**Draft revisions of the Agreement exchanged between**
**Mr. Bartlett and other employees of Equity Trust**
**(Tabs 30, 31, 33, 34, and 40)**

{¶36} Tabs 30, 31, 33, 34, and 40 contain the final draft revisions of the Agreement that were exchanged between Mr. Bartlett and five other employees of Equity Trust: Renee Tollett, Brendan Hughes, Joseph Ramirez, Amanda Genther, and Shafayet Imam. As previously discussed, Mr. Bartlett was aware that the draft revisions to the Agreement were for legal advice. As for these five employees, Mr. Dea averred that they assisted him and Mr. Bartlett in implementing the final changes to the Agreement, which were the result of continuous consultation with Ulmer & Berne. Ms. Tollett is a Forms Specialist and Mr. Hughes is a Marketing Manager at Equity Trust. The job titles for the other three employees are not identified. Mr. Dea's averment is further supported by the emails included for reference with each of these Tabs.

{¶37} Tab 30 contains an email chain, which started with Mr. Hughes emailing Ms. Tollett the proposed language for the quarterly statement. The proposed language referred to the "updated and revised" Agreement and summarized some of the changes in the Agreement. In a

subsequent email from Mr. Hughes to Mr. Bartlett and Mr. Ramirez and copied to Ms. Tollett and Ms. Genther, Mr. Hughes asked Mr. Bartlett to send him and Ms. Tollett the updated Agreement so they could begin working on the document to get it ready to send with the quarterly statements. Mr. Bartlett responded to all, but specifically addressed the email to Ms. Tollett and Mr. Hughes. Mr. Bartlett forwarded to them the final version of the Agreement with the changes highlighted and requested that they provide him a mocked up version of the Agreement by the end of the day.

{¶38} In Tab 31, Ms. Tollett responded to Mr. Bartlett's email and included Messrs. Hughes and Ramirez in the email and copied Ms. Genther. Ms. Tollett indicated that the attached document was the updated Agreement. She then asked if there was any consideration given to updating the dated references in the Agreement. She also indicated that there were "COLA revisions" that should be included in the Agreement and asked if that should be done now.

{¶39} The final version of the Agreement in Tabs 34 and 40 reflected the changes suggested by Ms. Tollett. Moreover, the billing records from Ulmer & Berne contain time entries for Attorney Kahn indicating that he reviewed and revised the Agreement to reflect law changes regarding threshold amounts.

{¶40} Additionally, the emails and revisions to the final Agreement in Tabs 33 and 34 reflect Ms. Tollett was primarily responsible for implementing the changes in the Agreement into the final document for release with the quarterly statement. Tab 37, which the trial court ordered not to be produced, also reflects Ms. Tollett implemented the final set of changes from counsel. The final Agreement in Tab 37 was sent to Attorney Fein for his review in Tab 38, which has been deemed an attorney-client communication by this Court. Based upon Ms. Tollett's intricate role in implementing the changes to the Agreement and her inquiry as to other possible changes based

upon the law, there is substantial evidence that she was aware that the purpose of the final draft revisions of the Agreement was to relay and obtain legal advice.

{¶41} Additionally, Mr. Hughes' communications with Ms. Tollett regarding the language for the quarterly statement notifying customers of the "updated and revised" Agreement and the substance of some of the changes, in conjunction with his request to Mr. Bartlett for a copy of the changes so they could begin working on preparing the final document, establishes that he was aware that the purpose of the final draft revisions of the Agreement was to relay and obtain legal advice.

{¶42} As for Mr. Ramirez and Ms. Genther, they were included in the initial emails regarding the implementation of the changes into the Agreement and Ms. Tollett's email asking about other changes based upon the law. Additionally, Mr. Ramirez was copied on the email in Tab 37 from Ms. Tollett which included an email chain with Mr. Bartlett regarding the status of the changes. The inclusion of Mr. Ramirez and Ms. Genther in these emails supports that they too were aware that the purpose of the final draft revisions of the Agreement was to obtain and relay legal advice.

{¶43} Lastly, Mr. Imam was directed by Mr. Bartlett to contact Ms. Tollett for the location of the changes in the Agreement. The email to Mr. Imam in Tab 40 contains an email chain between Mr. Bartlett and Ms. Tollett regarding the implementation of the changes to the Agreement, questions about the effective date of the changes, and confirmation that there were no further changes. Based upon the email chain between Ms. Tollett and Mr. Bartlett that was forwarded to Mr. Imam, there is proof that Mr. Imam was aware that the purpose of the final draft revisions of the Agreement was to obtain and relay legal advice.

{¶44} Each of these Tabs contained revisions to the final Agreement. While these employees were involved in preparing the Agreement for inclusion with the quarterly statements and such action could be construed as a business issue, the predominant purpose of the revisions to the final Agreement was to relay and seek legal advice and they are thereby protected by attorney-client privilege. *See Cooey*, 269 F.R.D. at 650. *See also In re OM Group Securities Litigation*, 226 F.R.D. at 587.

{¶45} At this stage of the revision process, Mr. Bartlett provided in Tab 30 the earlier changes vetted by Ulmer & Berne to these employees to implement into the final Agreement. The final draft revision of the Agreement in Tab 30 is the same document sent to Attorney Fein in Tab 28 and to Attorney Kahn in Tab 32. We have concluded Tab 28 is an attorney-client communication, and the trial court ordered Tab 32 not to be produced.

{¶46} Additionally, Ms. Tollett's inquiry as to additional changes to the Agreement based upon law changes was for the primary purpose of obtaining legal advice. The billing records confirm this purpose as there are time entries for counsel's review and analysis of the final Agreement, research and revision of the final Agreement to reflect law changes, and conferences with Messrs. Bartlett and Dea regarding further revisions to the final Agreement. Based upon the billing records, counsel provided a constant flow of legal advice during the finalization of the Agreement.

{¶47} Further support that the final draft revisions of the Agreement were for the predominant purpose of obtaining legal advice and not a business decision is the fact that the final draft revisions of the Agreement implemented by Ms. Tollett were subsequently sent to counsel for their review and analysis. For instance, version 3 of the final draft revisions in Tab 34 was sent to Attorneys Fein and Kahn in Tab 35, and version 5 of the final draft revisions in Tab 37 was sent

to Attorney Fein in Tab 38. These final draft revisions were reviewed, analyzed, and revised by Attorneys Fein and Kahn and were integral to the give-and-take communications with Equity Trust wherein legal advice was sought and given. *See Wilkinson*, 2014 WL 953546, at *3.

{¶48} For the foregoing reasons, the predominant purpose of the final draft revisions of the Agreement was to relay and seek legal advice, and Tabs 30, 31, 33, 34, and 40 are protected by the attorney-client privilege.

**Conclusion**

{¶49} As a result of our independent review, we conclude that Tabs 1, 2, 4, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 38, 39, and 40 are privileged attorney-client communications. Accordingly, the trial court erred when it ordered the Equity Defendants to produce these documents to the Plaintiffs.

{¶50} The Equity Defendants' sole assignment of error is sustained.

III.

{¶51} Equity Trust Company, Equity Administrative Services, Inc., Jeffrey Desich, and Richard Desich, Sr.'s sole assignment of error is sustained. The interlocutory order of the Lorain County Court of Common Pleas ordering the Equity Defendants to produce the documents to the Plaintiffs is reversed.

Judgment reversed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellees.

 

 

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

THOMAS R. LUCCHESI, BRETT A. WALL, JAMES H. ROLLINSON, and DAVID F. PROANO, Attorneys at Law, for Appellants.

STUART E. SCOTT, DENNIS R. LANSDOWNE, NICHOLAS A. DICELLO, and KEVIN C. HULICK, Attorneys at Law, for Appellees.